PAUL CHAMPAGNE and PAMELA CHAMPAGNE, Appel-
lants, *v.* WELFARE DIVISION OF THE NEVADA
STATE DEPARTMENT OF HUMAN RESOURCES,
Respondent.

No. 13677

JUDITH ANN FELSEN, Appellant, *v.* NEVADA
STATE WELFARE DIVISION, Respondent.

No. 14100

MELVIN MURPHY and JEENEAN GERTRUDE SNYDER
MURPHY, Appellants, *v.* THE WELFARE DIVISION OF
THE STATE DEPARTMENT OF HUMAN RESOURCES,
Respondent.

No. 14653

CHERYL TOLLIVER HICKERSON, Appellant, *v.* DON
PINSON and KATHRYN PINSON, Respondents.

No. 14906

December 6, 1984                    691 P.2d 849

*Robert W. Lueck,* Las Vegas, for Appellants Champagne and Champagne.

*Brian McKay,* Attorney General, Carson City; *Terrance P. Marren,* Deputy Attorney General, Las Vegas, for Respondent Welfare Division.

*John G. Watkins,* Las Vegas, for Appellant Felsen.

*Brian McKay,* Attorney General, Carson City; *Israel L. Kunin,* Deputy Attorney General, Las Vegas, for Respondent Welfare Division.

*Gerald W. Hardcastle,* Las Vegas, for Appellants Murphy and Murphy.

*Brian McKay,* Attorney General, Carson City, *Daniel Hollingsworth,* Deputy Attorney General, Las Vegas, for Respondent Welfare Division.

*Thomas E. Shulman,* Las Vegas, for Appellant Hickerson.

*Gardner & Stoebling* and *R. Michael Gardner,* Las Vegas, for Respondents Pinson and Pinson.

## OPINION

By the Court, SPRINGER, J.:

This opinion considers four appeals in which the parental rights of fathers and mothers have been permanently terminated by judicial decree. Severance of parental rights is an exercise of awesome power, a power which we "question closely" as we consider the four cases before us. Casper v. Huber, 85 Nev. 474, 477, 456 P.2d 436, 438 (1969).

TERMINATION OF PARENTAL RIGHTS: APPLICABLE LAW

NRS 128.110 authorizes the courts to terminate the legal relationship of parent and child "upon finding grounds" set out in the statute. NRS 128.105[1] provides that a termination order "may be made on the grounds that the termination is in the child's best interest in light of the considerations set forth in this section and NRS 128.106 to 128.108, inclusive." The "considerations" set forth in the section include abandonment, neglect, unfitness of the parent, child abuse and a rather hazy, probably redundant consideration phrased as "[o]nly token efforts by the parent" to avoid or prevent abandonment, neglect, unfitness or abuse. Whatever "token efforts" might mean, we read NRS 128.105 as a whole to mean that termination of parental rights is to be based on substantial abandonment, neglect, parental unfitness or child abuse.

By NRS 128.106 the court is given direction in "determining neglect or unfitness of a parent" in that the courts are required to consider certain conditions which relate to "*suitability* as a parent." (Emphasis supplied.)

From a reading of the foregoing sections and Chapter 128 as a whole we conclude that there are two kinds of grounds necessary to be considered in termination proceedings. One relates to parental conduct or incapacity[2] and the parent's suitability as a parent; the other relates to the best interest of the child.

---

[1]NRS 128.105 provides:

128.105   Grounds for terminating parental rights: Basic considerations.   An order of the court for termination of parental rights may be made on the grounds that the termination is in the child's best interest in light of the considerations set forth in this section and NRS 128.106 to 128.108, inclusive:
1.   Abandonment of the child;
2.   Neglect of the child;
3.   Unfitness of the parent;
4.   Risk of serious physical, mental or emotional injury to the child if he were returned to, or remains in, the home of his parent or parents;
5.   Only token efforts by the parent or parents:
(a) To support or communicate with the child;
(b) To prevent neglect of the child;
(c) To avoid being an unfit parent;
(d) To eliminate the risk of serious physical, mental or emotional injury to the child; or
6.   With respect to termination of parental rights of one parent, the abandonment by that parent.

[2]The term "incapacity" is used to refer to instances in which jurisdiction to terminate arises not out of the fault or misconduct of the parent, but, rather, out of the parent's clear incapacity to be a parent independent of any fault. Statutory definitions of abandonment, neglect, abuse, and unfitness all

Putting it another way: there must be *jurisdictional* grounds for termination—to be found in some specific fault or condition directly related to the parents—and dispositional grounds—to be found by a general evaluation of the child's best interest.

We borrow from Ketcham and Babcock[3] to state the general proposition in these terms: "The jurisdictional question is whether the biological parent, by behavior, has forfeited all rights in the child. The dispositional question is whether terminating parental rights would be in the best interest of the child. The first question focuses on the action, or inaction, of the natural parent. The second focuses on the placement which will be most beneficial to the child. If it is first decided that the parent has forfeited his rights in the children, then the court moves on to the second question. On the other hand, if it is decided that the biological parent's behavior does not violate minimum standards of parental conduct so as to render the parent unfit, then the analysis ends and termination is denied. In these latter instances, the court never reaches the question of whether the child's future well-being would be better served by placement with the substitute or psychological parent."

## Jurisdictional Grounds

The jurisdictional aspect of termination proceedings focuses on the "fundamental liberty interests of the natural parents in the care, custody, and management of their child," and this interest "does not evaporate simply because they have not been model parents or have lost temporary custody of the child to the State." Santosky v. Kramer, 455 U.S. 745, (1982). "The importance of this [liberty] interest cannot easily be overstated. Few consequences of judicial action are so grave as the severance of natural family ties. Even the convict committed to prison and thereby

---

involve or imply fault by way of refusal to act or breach of some parental duty. Recent legislative enactments make it clear, however, that a jurisdictional basis can exist in cases where parental capacity is lacking through no fault of the parent. Principal examples of such incapacity are "[e]motional illness, mental illness or mental deficiency of the parent which renders the parent consistently unable to care for the immediate and continuing needs of the child." NRS 128.106(1). Although one may question the justice of terminating the parental rights of the mentally handicapped, this seems to be the legislative intent.

[3]Ketcham and Babcock, *Statutory Grounds for the Involuntary Termination of Parental Rights,* 29 Rutgers L.Rev. 530 (1976). Note that this terminology and process have been judicially recognized. *See* In re Adoption of Children by D., 293 A.2d 171 (N.J. 1972); In re Willis, 207 S.E.2d 129 (W.Va. 1973, cited in Ketcham, *op. cit.*

deprived of his physical liberty often retains the love and support of family members." *Santosky,* Rehnquist dissent, at 787.

Because of the sacredness of parental rights a higher standard of proof, that of "at least clear and convincing evidence," is required before the children can be judicially taken away. *Santosky,* above. Also, the degree and duration of parental fault or incapacity necessary to establish jurisdictional grounds for termination is greater than that required for other forms of judicial intervention.

For example, a judicial determination that a child has been neglected may call for varying degrees of state intervention, ranging from mild reprimand to permanent termination of parental rights. Neglect is a relative term applied to a child who "lacks the proper parental care by reason of [parental] fault." NRS 128.014. Although it is difficult to define "proper," it is probably true that all parents are at one time or another guilty of neglecting to give their children "proper" care. To provide a jurisdictional basis for termination, neglect must be serious and persistent and be sufficiently harmful to the child so as to mandate a forfeiture of parental rights.[4] In such a case a parent may be adjudged to be *unsuitable* to maintain the parental relationship and, therefore, to *deserve* to lose it.

The same principles apply to the jurisdictional ground of unfitness. Unfitness is the other side of the neglect coin. Neglect defines a condition of the child; unfitness describes a condition of the parent. A neglected child is one who does not receive *"proper"* care; an unfit parent is one who fails to provide a child with *"proper"* care. Again: all parents are guilty of failure to provide proper care on occasion; and a parent does not deserve to forfeit the sacred liberty right of parenthood unless such unfitness is shown to be severe and persistent and such as to render the parent *unsuitable*[5] to maintain the parental relationship.

[4]*See, e.g.,* In re People in Interest of M.M., 520 P.2d 128 (Colo. 1974), holding that termination requires a showing of serious neglect which would probably persist in the future. *See also,* Sec. 12 *Model Statute of Termination of Parental Right,* National Council of Juvenile and Family Court Judges, in which this quality of persistency is defined in terms of a parent's conduct or condition being "unlikely to change in the foreseeable future."

[5]We use the term "unsuitable" (*see* NRS 128.106) in a special sense to describe a parent who by reason of persistent fault or state of incapacity deserves to have his or her parental rights terminated or who must sacrifice such parental rights in the interest of the child, by reason of irremedial inability to function as a proper and acceptable parent. We distinguish

In like manner, abuse of a child may or may not render a parent unsuitable to be a parent. NRS 128.105 lists as a ground or consideration for termination "[r]isks of serious physical, mental or emotional injury to the child if he were returned to, or remains in the home. . . ." Such a risk may be mitigated, and a child may be safely returned to the home; or the risk may be of such magnitude and persistency as to render the parent unsuitable and justify forfeiture of parental rights.

### Failure of Parental Adjustment

Our discussion of jurisdictional grounds cannot be complete without adding to abuse and neglect, unfitness and abandonment, another ground revealed in the interstices of NRS Chapter 128. It is difficult to give this ground a name or designation, but, essentially, it consists in a parent's being unable or unwilling within a reasonable period of time to remedy substantially conditions which led to a child's out-of-the-home placement, notwithstanding reasonable and appropriate efforts on the part of the state and others to return the child.

The new ground, finding its way into law in the 1981 legislative session, has its mediate origin in the Juvenile Justice Standards Project, *Standards Relating to Abuse and Neglect,* Standard 8. These standards, adopted jointly by the American Bar Association and the Institute of Judicial Administration, are in turn largely based on theories published in a book entitled *Beyond the Best Interests of the Child.*[6]

---

unsuitability from unfitness, the latter being a statutorily defined condition capable of broad variations as to duration and degree. Unsuitability may result from serious and persistent unfitness, abuse or neglect, or from abandonment. Although the two words have been used interchangeably, we find the stated distinction between unsuitability and the narrower concept of unfitness to be very useful in describing the essence of the jurisdictional basis for termination. Absent a showing of unsuitability, invasion of the liberty interest in parenthood is not constitutionally warranted. The United States Supreme Court has questioned the constitutionality of termination absent such a finding. *See Santosky,* footnote 10 at 760: "Nor is it clear that the State constitutionally could terminate a parent's rights without showing unfitness [unsuitability as used here]."

[6]A full understanding of this jurisdictional ground for termination cannot be gained without understanding the general trend toward diminishing the value of parental autonomy in its balance with the child's interest to a stable and nurturing environment. This means a shift of emphasis from the jurisdictional to the dispositional basis for termination, that is to say, away from parents' rights toward children's interests. This is particularly true in cases of long term foster placements in which a relationship of "psychological" parent and child has been established. This trend can be traced to certain

The gist of the new ground, which might be abbreviated as "failure of parental adjustment" finds its matrix in NRS 128.107 and 128.108, which enumerate "specific considerations" applicable when a child is not in the physical custody of a parent or when the child has been placed in a foster home.

---

psychoanalytically-based theories announced in 1973 by the publication *Beyond the Best Interests of the Child,* by Joseph Goldstein, Anna Freud, and Albert Solnit. The authors claim to present proposals for reforming the child welfare system in a manner that is supported by psychoanalytic theory.

Goldstein, Freud, and Solnit base their program on two fundamental beliefs: that the law should make the child's not the parent's needs paramount and that permanency of relationship is the first and most important developmental need of a child. Under their theory the state should not disrupt the relationship of a child who has been removed from his home when the child has developed a relationship with what the authors term a "psychological parent." The theory has brought about the institution of "permanency programs" which promote termination of parental rights followed by adoption as being the best means of satisfying the children's psychological needs. Accordingly, a foster parent who has established a relationship with a child would take precedence over a natural parent, even if the natural parent has lost custody of the child through no fault of his own.

The influence of Goldstein, Freud, and Solnit and "permanency planning" is evidenced in NRS 128.106 and NRS 128.107, added to the Nevada Revised Statutes in 1981. This statute provides that in cases of foster placement where the welfare agency's goal is to have the foster parents adopt the child, the court must consider whether the child "has become integrated" into the foster family to the extent that his familial identity is with that family. The court is even required to compare the real parents with the foster parents to see who can best "give the child love, affection and guidance and to continue the education of the child . . . and the capacity . . . to provide the child with food, clothing and medical care . . . [and the] moral fitness, physical and mental health" of real parents versus new parents.

Under the mentioned psychoanalytic theory, poor and marginally adequate parents are always under a threat of permanently losing their children. It is very difficult for such parents to avoid, at some time or another, finding that they have failed to meet the standards of parenting which the more fortunate of us have grown to respect. If they are so unlucky as to come in contact with agencies of the state and to suffer temporary loss of custody of their children, they are likely to find themselves in a classic "Catch-22" situation, thus: contact with their children is made difficult or impossible; they are thrust into "counseling" and parenting programs in which they have little chance of success; the children are likely to have grown used to neater, cleaner, and more intelligent, possibly more permissive parents, with whom, although they still love their natural parents, they have developed some degree of attachment.

The last step in this scenario is when the natural parents are told that their children now have some nice, new parents, a scenario not to distant from what is presented in at least one of the cases before us.

Except in the *Hickerson* case, there is no evidence in any of the cases before us of the establishment of any such extraparental relationship, and there is no direct applicability of the mentioned theories. We agree that children's interests should be paramount; but their interests cannot displace established liberty interests of natural parents. Children cannot be taken from poor parents and placed permanently in the home of substitute parents simply because their "emotional needs" would be better served or because they might have a cleaner, neater, or richer environment.

These "specific considerations" form a number of heterogeneous matters to be considered "in determining whether parental rights should be terminated." The list includes factors of both jurisdictional and dispositional import. For example, in assessing the duties of a parent who has been separated from his or her child, the court must consider the services provided or offered to the parent "to facilitate a reunion with the child" and the effort of the parent to adjust "circumstances, conduct or conditions" to justify the child's return home within a "reasonable length of time."

The idea of permanently taking a child from a parent by reason of the parent's failing to adjust to "circumstances, conduct or conditions" prescribed by the state is an idea that is new to public family law. The idea is part of what have been called "permanency programs" (*see* footnote 6) which can be traced to the early 1970's. These programs call for increased efforts to keep children in their natural families, mandatory periodic review of out-of-home placements and, significantly, termination of parental rights to free children for adoption when it appears that parents will be unable to resume custody within a reasonable period of time.

Certainly no one can quarrel with the idea of promoting permanency and stability in the lives of children. Still, we must remember that poverty, sickness, and other such eventualities may result in the separation of children of a loving and quite *suitable* parent. There is always the risk that passage of time might result in a situation in which a child develops new relationships—becomes "integrated" into a foster family or otherwise becomes estranged from natural parents. Caution must be exercised not to allow termination proceedings to be carried out absent a showing of unsuitability on the part of the parent by reason of the parent's fault or incapacitation. We must be extremely careful in concluding that a parent has crossed the line of unsuitability. This is true because of the vast power differential between the state and the welfare client, the paucity of truly efficacious "services" that are or can be made available to the client, the usually greatly diminished contact between welfare client-parents and the removed child and the oft-seen ineptitude of the so-called "inadequate" parent. (*See* footnote 7, below).

On the other hand, there does come a time when society must give up on a parent. A child cannot be kept in suspense indefinitely. If a child is removed from the home, a parent must exercise reasonably diligent efforts to seek the child's return. A parent's failure to make such efforts may, under our statutory

scheme, result in the court's finding that the parent is unsuitable by reason of unfitness or neglect in the form of failing or refusing to adjust after the child was removed. The parent, however, still must be shown to be at fault in some manner. The parent cannot be judged unsuitable by reason of failure to comply with requirements and plans that are unclear or have not been communicated to the parent, or which are impossible for the parent to abide by. Failure of parental adjustment may provide a jurisdictional basis for termination, but it is fraught with difficulties and must be applied with caution.

### Dispositional Grounds

In order to justify termination of parental rights the court must, after finding jurisdictional grounds for termination, find dispositional grounds—that the child's interest would be served by termination. It is certainly possible for the court to find that a parent was unsuitable and still not be able to find the requisite dispositional grounds for termination. For example, the *Juvenile Justice Standards Relating to Abuse and Neglect,* Standard 8.4(c), provides that a court should not order termination (as it did here in the case of Billy Murphy) where, because of the nature of a child's problems, the child is placed in a residential treatment facility, and continuation of parental rights does not interfere with proper or necessary permanent placement efforts. The Standards recognize that even where jurisdictional grounds exists, there are cases in which termination is not indicated. As in the case of Billy Murphy, if a disturbed child is placed in a treatment center, there is no point in depriving him of whatever support the natural parents might give. Another example would be when an older child (ten or older by Standard 8.4) expresses the wish not to have parental rights terminated. In these and in a number of other possible examples, jurisdictional grounds may exist and the parent may deserve to have parental rights terminated, but the interest of the child is not necessarily best served by the termination. The test is this: If under no reasonable circumstances the child's best interest can be served by sustaining the parental tie, dispositional grounds for termination exist.

Each case must be considered on its own terms. The court may consider "[w]hether additional services would be likely to bring about a lasting parental adjustment . . . within a predictable period of time," NRS 128.107(4); it may consider the physical, mental, or emotional conditions and needs of the child, including the child's desires, NRS 128.107(2); or it may conclude that the natural parents are so depraved or so disinterested that it appears

that even having no parents is better than having this kind of parent. The overlying dispositional issue is that of the welfare of the child; and, as said, when it appears that the child's interest will not be served by preserving the relationship, the relationship should be terminated.

Applying these principles to the cases before us, we affirm *Champagne* and *Hickerson* and reverse *Murphy* and *Felsen*. We take up the reversals first.

### MELVIN MURPHY and JEENEAN GERTRUDE SNYDER MURPHY, No. 14653; Reversed

This is a case in which the district court found that Mr. and Mrs. Murphy were unfit parents, that they had neglected their children, and that they "would always continue" to neglect their children.

There are three children involved. Billy, now 13, is a serious behavioral problem who had to be removed from the home and placed in a residential program for behaviorally disturbed children. The two other children are girls, Tanya and Angela, now 12 and 10. The girls have suffered from learning disabilities and some difficulties in school and in social development. The three children have been placed in three different residential placements.

The separation of the girls from their parents and from each other seems to have been precipitated by the visit and report of a volunteer worker who described the Murphy home as "filthy."

The volunteer made only the one visit to the Murphy home because "[h]e wouldn't go into the area they are in now." Nevertheless, after this one visit he recommended that parental rights be terminated as soon as possible. This report prompted a neglect complaint which was filed against the Murphys on April 23, 1981. The following day, a juvenile court services officer removed Tanya and Angela from the Murphy home. The juvenile officer testified that the action was based on the supposed mental deficiency of the parents accompanied by "destitution bordering on marginal environmental neglect." Interestingly, the officer stated that he had "seen more filthy homes" than the Murphy residence. He also testified that when he removed Tanya and Angela, they "appeared to be all right. Their dress was normal. Their clothes might have been a little larger than would have been normal, and they appeared to be . . . not in hunger pains or anything like that."[7]

---

[7]The Murphy's might, under one reading of the evidence, be said to be inadequate parents, this is certainly not to say unsuitable parents. An understanding of what is meant by "inadequate parenting" can be gained from a reading of the following:

Following a juvenile court hearing on June 16, 1981, the girls were made wards of the court. On June 23, 1981, they were both placed in Child Haven. On February 12, 1982, the state filed a petition to terminate the Murphys' parental rights as to all three children. Following a hearing on June 25 and 28, 1982, the district court terminated the Murphys' parental rights.

It does not appear from the record that termination in this case can be upheld on the basis of the jurisdictional ground of neglect. There is no contention or finding that the Murphys were in any way at fault (other than in being poor and wanting in neatness and cleanliness). They are not unfit, neglecting, abusing, or abandoning parents; and any supportable jurisdictional ground would have to have been based on a finding of parental unsuitability based on the parents' supposed incapacity to raise their children in an acceptable manner.

There are only two possibilities of finding the Murphys to be unsuitable in the stated manner; and both possibilities exist

---

*Inadequate parenting*

While no empirical studies provide a statistical breakdown of the reasons for intervention in neglect cases, probably the largest category of cases involves persons thought to be "inadequate parents." All commentators agree that the great majority of neglect cases involve very poor families who are usually receiving welfare. Most of the parents are not merely poor, however. In addition to the problems directly caused by the poverty—poor housing, inadequate medical care, poor nutritional practices—many of these parents can be described as extremely "marginal" people, that is they are continually at the border-line of being able to sustain themselves—economically, emotionally, and mentally.

Their plight is reflected in their home situations. Their homes are often dirty and run-down. Feeding arrangements are haphazard. One or both parents may . . . be retarded, which may affect the quality of their child care. . . .

Such parents may provide little emotional support for their children. While the children may not be physically abused, left unattended, dangerously malnourished, or overtly rejected, they may receive little love, attention, stimulation, or emotional involvement. . . .

It is certainly very tempting to intervene to help such children. Intervention might be justified both to protect the children by providing them with an environment in which they can better reach their potential and to protect the state, since it is claimed that such children will probably end up as delinquents, criminals, or welfare recipients. Without intervention, we may be perpetuating a "culture of proverty."

Despite the appeal of these arguments, parental "inadequacy" in and of itself should not be a basis for intervention, other than the offer of services available on a *truly* voluntary basis. The term "inadequate home" or "inadeqate parent" is even harder to define than emotional neglect. There is certainly no consensus about what types of "inadequate" behavior would justify intervention. Given the vagueness of the standard, almost unlimited intervention would be possible.

. . . . In fact, by focusing solely on parental behavior, child-care workers often ignore the many strengths a given child may be deriving

because of the language of NRS 128.106, which, as mentioned above, sets out "conditions which may diminish suitability as a parent." The two possibilities are found in subsections 1 and 7 of NRS 128.106.

The condition mentioned in subsection 1 is "[e]motional illness, mental illness or mental deficiency which renders the parent consistently unable to care for the immediate and continuing physical or psychological needs of the child for extended periods of time."

There are a number of reasons why this condition does not apply to the Murphy family. First, it is noted that the only suggestion in the record of mental deficiency relates to Mr. Murphy and not Mrs. Murphy. The record reflects that Mrs. Murphy, who is unquestionably mentally competent, is the "primary care giver." Thus, the family as a unit is competent to care for the children; and even if Mr. Murphy were of questionable intelligence, it makes no real difference under the circumstances of this case. The only evidence relating to mental retardation of Melvin Murphy is found in the testimony of the director of

---

from his environment. As I have stressed, the complexity of the process by which a child relates to any environment defies any attempt to draft laws solely in terms of environmental influences.

Moreover, there is every reason to be extremely pessimistic about the utility of coercive intervention. The services necessary to help these families are generally unavailable. More day-care centers, home-makers, health facilities, and job training programs would all be needed if intervention were to mean anything more than periodic visits by a social worker. Such visits themselves are costly, have not been shown to be effective, and may be resented by the parent who will blame the child for the outside meddling.

Even when "inadequate" parents seek help, agencies often lack the recourses or ability to alleviate undesirable home conditions. The chances of success are even lower when the family resists intervention. Few communities have sufficient personnel and programs to permit meaningful intervention, even in cases involving physical abuse or severe emotional damage. It is highly questionable whether limited resources ought to be expended on families with less severe problems, unless the families request services or accept them voluntarily.

Furthermore, when parents do not respond to the "treater," the next step is to remove the children. Yet there is no evidence demonstrating that children from such families are helped through placement.

In an ideal world, children would not be brought up in "inadequate" homes. However, our less than ideal society lacks the ability to provide better alternatives for these children. The best we can do is to expand the social welfare services now offered families on a voluntary basis.

M. Wald, State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards, 27 Stan. L. Rev. 985, 1021-24 (1975), *quoted in* Wadlington, W., Whitebread, C., Davis, S., *Children in the Legal System,* Foundation Press: New York, 747-49 (1983). (Footnotes omitted.)

Outreach Services, an agency responsible for services to the mentally retarded. The director, who has degrees in education and counseling, mentioned off-handedly that "although he fits our criteria, he [Mr. Murphy] isn't the primary care giver." This is the only evidence relating to Mr. Murphy's mental capacity. The record does not disclose the degree, if any, of Mr. Murphy's supposed mental incapacity. There is no proof in the record that Mr. Murphy's mental condition renders him in any way unable to care for his children, much less "consistently unable" to care for them "for extended periods of time." Mr. Murphy's ill-described mental condition cannot provide jurisdictional grounds for termination.

The second possible condition relates to the possibility of a finding of jurisdictional grounds based on failure of parental adjustment. Under subsection 7 of NRS 128.106, the "[i]nability of appropriate public or private agencies to reunite the family despite reasonable efforts on the part of the agencies" can be considered as a factor which tends to "diminish suitability as a parent."

One of the state's witnesses characterized the Murphy's home thus: "[T]his lifestyle is not significantly different than that of other families in their income bracket and who live in the apartment complex." The court expressly found that the Murphys were "cooperative with public agencies" and that "they love their children;" still, the court went on to say that "the public agencies have become frustrated at the failure to solve the problems keeping this family apart."

To dissolve a loving, cooperative family because of a welfare agency's "frustration" appears on its face to be a bit Herodian; but this aside, the main problem with this case is that on this record the Murphys do not appear to have been given a fair chance to cooperate with the supposed efforts to "reunite the family." In this case, the many "plans" proposed to the Murphys failed to specify relevant criteria to determine successful completion. In People v. C.A.K., 628 P.2d 136 (Colo.App. 1980), the lower court's order terminating parental rights for the appellant's failure successfully to complete treatment plans was reversed. The Colorado court held that "if a trial court intends the successful completion of a treatment plan as a condition for the return of a child, then the treatment plan must specify what the relevant criteria will be to determine success." People v. C.A.K. at 140. NRS 128.0123 seems to provide, in conjunction with NRS Chapter 62, for an agreement between parties, the court, and the agency having custody of the child, which may impose conditions leading to return of the child, or, if the parents refuse to comply,

for freeing the child for adoption. Although the appellants designated all exhibits for the record on appeal, the "case plans" are not included in the record. Also, without the case plans it is impossible to review the record on this issue or to hold on the basis of clear and convincing evidence that the Murphys did not fail to abide by the supposed agreement or plan.

It is true that Billy Murphy has a serious behavioral problem which necessitated his removal from the home so that this disorder could be attended to professionally. No one is waiting in the wings to adopt him and whisk him off to a loving, middle class family. Billy is exactly the kind of child who *needs* the support of his family and who should *not* have his parents' rights terminated. *See* Juvenile Justice Standards Project, Standard 8, above.

It is also true that the two girls were having problems in school and with problems of social adjustment. These problems appear to have been relieved somewhat after their removal from the home; but, here again there is no evidence that their lot would be improved, without their consent, by the permanent loss of their natural parents.

Because of these latter conclusions it is also very doubtful that dispositional, "child's-best-interest" grounds are present; but this need not be decided, for there are clearly no jurisdictional grounds for termination. The Murphys have not been clearly or otherwise shown to be unsuitable parents by reason of neglect, unfitness, or other fault or incapacity which would justify taking their children away from them forever.

The termination order must be reversed. This court is not sufficiently informed to pass judgment on the optimum placement of the children at this time. The matter must be remanded for this purpose. The children have been split up and taken from their parents. Billy may need continued residential treatment, but he still needs his parents. The two girls have been placed out of the home for such a period of time that reunification with their parents will probably be difficult; but the parents should have a chance, and the children should have a chance to have the family brought together. If this cannot be done, it is possible that termination proceedings could be later completed in conformance with this opinion.

### *JUDITH ANN FELSEN, No. 14100; Reversed*

Judith Felsen is the mother of four children, who, at the time of the termination hearing, were ten, nine, seven, and five. Although the petition charges parental unfitness, neglect, and abandonment, the only finding of jurisdictional grounds in the

order is that of neglect. The court found that the "allegation of neglect is true; specifically, Judith Ann Pendleton Felsen, by clear and convincing evidence, has neglected the above-named children."

The jurisdictional ground of neglect is not supported by the evidence.

The charge of neglect as it appears in the petition states that the mother "neglected or refused to provide proper or necessary subsistence, education, medical or surgical care, or other care necessary for the above-named minor children's health, morals or well being *since at least May 15, 1979.*" (Emphasis supplied.)

The meaning of "since at least May 15, 1979" is not clear. Perhaps a sensible interpretation of the phrase would be that the mother was neglectful for sure since (after) May 15, 1979, and was possibly neglectful at other unspecified times—not a very definitive allegation upon which to base a proceeding designed to take a mother's children away from her permanently.

In our view, the charging allegation does not put into issue acts of neglect occurring prior to May 15, 1979. Even if it did, incidents of such supposed neglect appearing in the record are episodic and certainly do not amount to the type of serious and persistent misconduct that would render Mrs. Felsen an unsuitable parent.

With regard to neglect occurring after the children were taken away, it is obvious that the mother cannot be charged with neglect to "provide proper or necessary subsistence, education, medical or surgical care, or other care" during a time when the children were not in her custody. *See* Chapman v. Chapman, 96 Nev. 290, 607 P.2d 1141 (1980). The only possibility of the existence of jurisdictional neglect, in this case, would arise out of the mother's failure to adjust after the removal of the children as discussed in the section of this opinion entitled "Failure of Parental Adjustment."

In regard to the latter, failure of parental adjustment question, we focus on the testimony of welfare officials who testified regarding the mother's conduct while her children were in welfare custody. It appears that a "case plan" was drawn up in March of 1980, about a year after the children were removed. During at least part of the time that she was separated from her children the mother was not permitted to see her children. The case plan required the mother to meet the following conditions: (1) to undergo mental health counseling, (2) to obtain and maintain employment over a six month period, and (3) to obtain and

maintain a stable residency. The worker who drew up the case plan could not remember whether a copy of the plan was sent to the mother or not.

Another worker took over the case in August of 1980. Mrs. Felsen was residing in Florida at the time. On November 3, Mrs. Felsen notified her welfare worker that she had returned to the State of Nevada. It is not entirely clear what Mrs. Felsen's status was with regard to the case plan as contacts between her and welfare were infrequent. She did reside in Florida for a while and consequently did not keep appointments at the Las Vegas Mental Health Clinic. It is clear that during the year period that the second assigned welfare worker had the case, Mrs. Felsen requested visitation several times and was denied.

At the time of the termination hearing Mrs. Felsen testified that she had a job and a nice home for the children. She also testified:

> I have nothing else on my mind except my children. This is the entire struggle that I have been through, and the reason that it has been difficult many times is because when a person loses—I mean I am very close to all four of my children. My children mean the world to me.

The district judge was, of course, free to reject or disregard Mrs. Felsen's testimony; but even if this were done, it does not seem that Mrs. Felsen was given a fair chance. Her major faults seem to have been her inability for some time to get a steady job and her failure to maintain a more steady contact with the agency having custody of her children, even though the agency would not, at certain times at least, permit her to see her children. All in all, it cannot be said clearly and convincingly that this mother conducted herself in her relationships with the welfare agency in such a manner as to make her an unsuitable parent and to require that she forfeit her parental rights to her four children.

Because jurisdictional grounds have not been established, we do not discuss dispositional issues. It is noted, however, that there is no finding or conclusion in the termination order that the interests of all four children or any of them, would be best served by severing their relationship with their mother. Neither does it appear that no reasonable alternative exists to this drastic action. The order must be reversed.

### PAUL CHAMPAGNE AND PAMELA CHAMPAGNE, No. 13677; Affirmed

Paul and Pamela Champagne were formerly, but are no longer, husband and wife. At the time of the hearing, held on April 6, 1981, they were living together. There are six children involved in the proceeding. Paul Champagne is the natural father of Steven, Crystal, and Jon Paul Champagne. Pamela Champagne is the natural mother of all six of the named children.

*Right to Counsel*

The first error claimed by appellants Champagne is the refusal of the district judge to appoint counsel to represent them in the proceedings below. In our opinion the district judge acted properly and did not err in this regard.

The state's petition to terminate the Champagne's parental rights came on for hearing on April 6, 1981. No answer or other denial of the allegations of the petition was filed at the time nor has any formal response ever been filed. The Champagnes appeared without counsel on April 6, 1981, and the court inquired solicitously concerning their desires in this regard. It appeared at this time that Paul earned $14.00 per hour and that he could afford to employ an attorney. Pamela expressly advised the court that she was not asking the court to appoint an attorney at the expense of the county.

The district judge was very emphatic in explaining to the Champagnes the importance of having counsel during such hearings. The judge observed that he knew of nothing more serious, short of facing a prison term, where there was greater need for representation by counsel. He then adjourned the hearing, noting that Paul smelled of alcohol and clearly advised the two that he wanted them back in court on May 11 without alcohol and with counsel.[8]

The order terminating parental rights recites that the Champagnes stated that they could, at the time of the later, May 11 hearing, still afford an attorney, but that they had not secured one. They further stated that they had talked to several attorneys but had decided not to secure the services of an attorney.

Under such circumstances we do not find it necessary to discuss any further the claim that the two were denied a right to court-appointed counsel; and we pass to the next point.[9]

*Propriety of Termination*

The Champagnes claim that there is no substantial evidence to support termination of their parental rights. There is.

---

[8] "Now I want you to make a note of it. [The May 11 date.] And I want you to make a note of two things. You had better show up with a lawyer on that day, and you had better show up without any booze on your breath or I am going to hold you in contempt of Court and lock you up."

[9] It has been argued on behalf of Pamela that at the April 6 hearing she indicated an inability to pay for an attorney and that Paul Champagne had no legal duty to pay for her attorney. The record, however, clearly shows that they were pursuing the same course, and it is recited without contradiction that "they" had spoken to several attorneys but decided not to employ counsel. The record fails to show that at the May 11 hearing Pamela had desired to employ counsel but was financially unable to do so.

Both neglect and its mirror image, parental unfitness, are well-established ·in the record of this case.

The Champagnes have police records involving narcotics, burglary, and child abuse. The children were frequently left unattended. Mr. Champagne, it appears, has an unbridled temper, particularly while under the influence of drugs or alcohol. He also has been a chronic alcohol and substance abuser.

■■■■ ■

A careful reading of this record discloses that by reason of the habits of the Champagnes' the children suffered serious and continued neglect. The record reveals parents who are unfit and who because of their unfitness and substantial neglect have become clearly unsuitable as parents.

■■■■ ■

On the issue of abandonment, the record further shows that the Champagnes did not, although they were required to do so, support the children during the two years they were in state custody. This and the general course of conduct engaged in by the Champagnes supports the jurisdictional finding of abandonment in this case.

■■■■ ■

A jurisdictional basis for termination can also be found in the Champagnes' failure to adjust in a timely fashion to a well-formulated case plan. In November, 1979, the welfare division entered into a service agreement with the parents. The state presented six witnesses, two juvenile court officers, three welfare division social workers and a mental health counselor, all had been involved in the effort to reunite the Champagnes with their children. All six of these witnesses testified that in the circumstances of this case they believed that termination of appellants' parental rights was in the best interest of the children.

■■■■ ■

Ample jurisdictional grounds have been established for the termination order. Dispositional grounds are also well-established. We have here children who for years have had to put up with drunkenness and an unacceptable family life. The children have advised welfare workers that they want a new life and that they want a new mother and father that they can count on. "I want a Mom and Dad like everyone else," one child was heard to say. Under these circumstances, we cannot say that the district judge abused his discretion in finding that the best interests of these children would be served by terminating parental rights. There is good cause appearing in the record to conclude that under no reasonable circumstances could the children's interests be served by sustaining the parental relationship. The termination order is therefore affirmed.

*CHERYL TOLLIVER HICKERSON, No. 14906; affirmed*

The jurisdictional ground for termination in this case is neglect. Evidence shows clearly and convincingly that the mother was guilty of such severe and continuous neglect as to render her unsuitable as a parent and to justify a permanent forfeiture of parental rights. There is no point in recounting here the sad story of Jason, suffice it to say that during his whole childhood Jason was forced to struggle, intermittently at least, with a mother who was drunk or drugged, who invited vicious, violent, and disreputable persons into the home. The home was in constant disarray and the child was deprived of love and attention to such a degree as to cause serious developmental problems. A reading of the record reveals serious and persistent neglect which clearly supports a finding that the mother is an unsuitable parent. We have no difficulty in affirming on jurisdictional grounds.

The trial judge also clearly acted within his discretion in making the dispositional decision that termination would be in the best interest of the child.

As we have pointed out above, evidence to support a jurisdictional finding of severe and continuous neglect does not of itself justify termination. It must also be found that the child's best interests would be clearly served by termination. This can only be done when it is found that under no reasonable circumstances can the welfare of the child be served by continuation of the parent-child relationship. There is substantial evidence in this record to support such a conclusion.

Appellant Hickerson makes two points on this issue that warrant discussion. The first is that a Mr. Gorman, who is executive director of a family counseling service, testified that in his opinion the child's best interest would not be served by severing "the relationship between Jason and his mother." Although Mr. Gorman is a social worker and not a psychiatrist or clinical psychologist, his opinion was offered to the court without objection and may be considered as some evidence on the dispositional issues. There is, it must be noted, a mass of evidence which is contrary to Mr. Gorman's opinion.

The petitioner in this case is the child's maternal grandmother. The boy is well-settled in his grandmother's home, and there is much evidence that he is now living a happy and stable family life for the first time. The child does not want to return to his mother's home.

The district judge acknowledged his need to consider all alternatives before making a decision; and it is apparent that he did so. There is ample evidence to support the conclusion in this case that no reasonable alternative, consistent with the welfare of the child, was available. This conclusion is properly within the range of the judge's discretion, notwithstanding Mr. Gorman's opinion to the contrary.

The second significant point raised by the mother relates to the fact that she was engaged in counseling at the time of the termination. Terminating her parental rights during such a time, she claims, is violative of the "spirit of NRS 128.107." This statute does require the court to "consider" efforts being made by a parent to modify the conditions which brought about removal of the child. The mother in this case has been undergoing counseling or "treatment" on an intermittent basis throughout the child's entire life. The trial judge did not abuse his discretion by entertaining termination proceedings simply because the mother was again engaged in one of her counseling programs.

Since both jurisdictional and dispositional grounds for termination have been clearly and firmly established, we affirm the order of the district court.

## SUMMARY AND CONCLUSION

Termination of parental rights is essentially, of course, a statutory proceeding; but the statute does not say it all. Overlying constitutional considerations, constantly recurring statutory amendments, and the rapidly evolving nature of present-day social theory and public policy make judicial interpretation an inevitable and indispensable part of critical legal operation. Today we decide four cases, and in doing so set forth general principles applicable to the process of severing the legal ties of parenthood.

We have held that one who institutes termination proceedings must be able to prove clearly and convincingly that there are both jurisdictional and dispositional grounds for termination. This means, first, that the parent must have provided some cause for the termination. Specific grounds—abandonment, abuse, neglect, unfitness, certain forms of incapacity or failure to adjust—must support a conclusion of parental unsuitability before termination of parental rights can be justified.

Jurisdictional grounds are not enough; it still must be shown that the child's interest would be better served by termination than continuation of the natural parent's relationship: or, as we put it, if under no reasonable circumstances the child's best

interest can be served by sustaining the parental tie, the second requirement, the dispositional ground, has been fulfilled.

This approach to a difficult and emotionally charged field of law seems to us to strike the best and fairest balance between sometimes opposing interests of parent and child. Termination of parental rights is an extreme measure. Often guardianship, wardship, and juvenile court custody decrees can be employed to serve and protect the interests and welfare of children at risk. If the "capital punishment of welfare law" must be invoked, it should be done only under the strictest of conditions as set forth in this opinion.

MANOUKIAN, C. J., MOWBRAY, STEFFEN, and GUNDERSON, JJ., concur.