*1192 OPINION
By the Court,
Young, J.:
This is an appeal from a district court’s order to terminate a mother’s parental rights. We conclude that jurisdictional and dispositional grounds were met and affirm the decision below.

FACTS

On July 28, 1993, sixteen-year-old Marla Blanchard Cooley (“Marla”) gave birth to Christina Ann Louise Blanchard (“Christina”). The father is Terry James Valladon (“Terry”). On July 18, 1995, the Division of Child and Family Services (“DCFS”) filed a petition to terminate Marla’s parental rights. Trial was conducted on April 10, 1996. On May 17, 1996, the district court ordered termination of Marla’s parental rights.
Shortly after Christina was born, she and Marla moved in with Terry and his mother, Sheila Bowen (“Sheila”). They continued to live there until November 1993. While living there, Marla attended New Horizons, a school for young mothers. Sheila testified at trial that at least several times a week she received a call from the school because Marla was unprepared for class. Sheila also testified that during this time period, Terry took primary care of Christina and that Marla would often forget to feed or change the baby. In addition, the baby would frequently cry out in pain when she was alone with Marla. Several times Marla would leave Christina on the sofa unattended where the baby could easily fall off.
In November 1993, Marla took Christina and moved into her mother’s rented mobile home. Sheila testified that Marla called Terry at all hours of the day and night and left threatening messages. Marla had also filed fraudulent rape and spousal battery charges against Terry. Sheila was concerned for her family’s safety because of Marla’s bad temper.
In January 1994, Marla and her family were evicted from their *1193 mobile home due to property damage and nonpayment of rent. Melvin Tehle, the landlord, testified that Marla’s family moved into the home in October 1993. Despite the short amount of time living there, the family completely destroyed the place. He described the condition of the home as filthy. The toilets were backed up since before Christmas 1993 and contained feces and urine. The bathtub also contained feces and urine. There was filth underneath the kitchen sink and all over the kitchen. The carpet had candle wax imbedded into the fibers. The brand new blinds were destroyed by an animal. There was several months worth of garbage outside the house. The sewer was leaking in the backyard. He also testified that many people came and went from the residence. Several animals and as many as nine people lived there at once, despite the fact that the lease allowed only four people.
In March 1994, Marla contacted DCFS for help taking care of Christina. On March 23, 1994, Marla entered into a homemaker services contract with Susan Hutchinson (“Hutchinson”) through DCFS. The goals of the contract were for Marla to learn basic homemaking, budgeting, and parenting skills. The contract required weekly meetings between Marla and Hutchinson. However, Marla did not keep many of these appointments. She would either not show up or would call with an excuse. Eventually, in May 1994, Hutchinson had to terminate the contract due to Marla’s noncompliance.
When Hutchinson visited Marla’s home in March 1994, she found it to be absolutely filthy. She testified at trial that the home was inappropriate and dangerous for a baby. There were cigarette butts, greasy car parts, and heavy boxes lying around, within easy reach of Christina. In addition, a handgun was kept on the coffee table.
Around March 30, 1994, Marla entered into a voluntary six-month agreement with DCFS to give up custody of Christina until Marla complied with a case plan. At the time DCFS obtained custody, Christina was dirty and sick with a fever and a runny nose. She was placed into a foster home. On April 28, 1994, after gradually increased visitation, Christina was placed with Terry, her father. This is where she currently resides.
During Marla’s visits with Christina, Marla would display inappropriate behavior. Specifically, she would introduce her new boyfriends to the baby as “daddy,” and she would compete with Christina for toys and affection. On occasion, Marla would throw Christina up into the air and almost not catch her or she would pick her up by only one of Christina’s arms. Hutchinson also testified that Marla had a bad temper, and when she did not get her way, she would curse loudly, storm around Hutchinson’s office, and slam the door.
*1194 Maureen Martin (“Martin”), Marla’s social worker since April 1994, also testified that Marla’s house was filthy and “trashed” and that Marla had a bad temper. In addition, Martin testified that Marla’s hygiene was so bad that during Marla’s visits to the DCFS office, the other staff members requested Marla’s visits take place outside because Marla had severely offensive body odor.
In July 1994, Marla and Martin had an argument in Martin’s office which resulted in Marla demanding Christina back from DCFS. Martin determined this was not in Christina’s best interest. Although the March 1994 custody agreement allowed Marla the right to take Christina back anytime, on July 7, 1994, DCFS filed a petition to retain custody of Christina. In its petition, DCFS alleged that Marla was not complying with the agreement or the case plan. Specifically, Marla failed to (1) obtain an income, either from a job or welfare; (2) obtain a decent place to live; (3) attend parenting classes; and (4) comply with the homemaker contract (which had previously terminated in May 1994 due to Marla’s noncompliance). Martin testified that DCFS tried to provide Marla with the help she needed, but that Marla simply did not do anything to enable herself to provide care and support for Christina.
Even after DCFS filed the petition, Marla still did not comply with the case plan. She made a few minor attempts, but never finished anything she started. Not one item in the case plan was ever accomplished. After Marla failed to show up for the first two evidentiary hearings regarding custody, the district court finally heard the matter on September 16, 1994. The court determined that Marla was unable to provide for Christina’s needs; therefore, Christina was made a ward of the court.
At the termination trial, another former landlord testified that Marla and her family moved into his mobile home on July 1, 1994. Within approximately one week, he visited the home and observed that they had not yet turned on the electricity, despite the fact that children, including infants, lived there. He also noticed that although only one week had passed, the place was already unsanitary and in disrepair. This included the presence of feces, dirt, and a terrible stench. On one occasion, he told Marla to clean the place. The landlord testified that Marla became abusive and used foul language while yelling at him. Although he evicted the family very shortly after they moved in, the place was damaged to the extent that it cost him $350.00 for cleaning and repair. This was in addition to the $720.00 they still owed him for rent. All together, Marla and her family lived there for twenty-five days before being evicted.
At the end of July 1994, DCFS found out that Marla was *1195 pregnant and not obtaining prenatal care. Therefore, DCFS attempted to help Marla obtain welfare so she could receive prenatal care. However, Marla failed to keep her appointments with the welfare office. On October 6, 1994, the district court finally ordered Marla to obtain Medicaid through welfare in order to have prenatal care.[1]
On August 24, 1994, Marla entered into a second homemaker contract with Hutchinson. This contract provided for extensive training and commitment by Marla. However, Marla still failed to comply with this contract and showed up only occasionally to the twice weekly meetings. Marla also did very poorly on tests that Hutchinson administered during their sessions despite Hutchinson’s thorough review of the material with Marla. Marla told Hutchinson that she knew how to raise Christina and that she did not believe her living conditions were harmful to Christina.
In August 1994, Marla told Martin that she was considering giving Christina up for adoption. Martin testified that Marla discussed this option on and off with her, although Martin never initiated the subject.
In October 1994, Marla married James Cooley (“James”). In December 1994, Marla and James moved to Ely. At this time, the second homemaking contract was terminated. In February 1995, Marla gave birth to her son, Christopher, in Reno. He was six weeks premature. Marla eventually relinquished her parental rights regarding him because she did not want the burden of a “special needs baby,” despite the fact that there was no evidence that he required special need. While Marla was in the hospital in Reno, Hutchinson took Christina to visit Marla. Marla cut this visit short because she preferred to play Nintendo video games. Marla did not visit with Christina again until September 1995 when she started once per month visitation.
Because James had difficulty finding steady work, he and Marla moved back to Carson City in approximately June 1995. There, according to James, they “bounc[ed] around . . . from place to place.” At trial, the district court questioned James about whether he or Marla had ever paid child support for Christina. James testified that they never paid anything because they have rent and “everything else” to pay. After pressing the matter, the court observed that Marla and James had money to feed their several dogs and cats, but no money to pay support for Marla’s daughter.
At trial, Martin testified that Christina’s best interest is to terminate Marla’s parental rights and leave Christina in the custody of her father, Terry. Terry is gentle, responsive and aware of *1196 Christina’s health, mental, and support needs. Martin specifically testified that she foresees no problem with Terry being a single parent. She also testified that Christina needs to get on with her life. Terry fears that he cannot protect Christina from Marla because she has threatened to take Christina and ran away to California. Martin also testified that there is a great risk of Marla neglecting Christina if allowed to continue her relationship with her daughter. Finally, Martin testified that Marla was just as immature and incapable of taking care of a child at the time of trial as she was when she first approached DCFS for assistance two years prior.
Marla testified at trial. In response to the question as to why her parental rights should not be terminated, Marla responded,
Cuz I gave up my childhood for that child. ... I gave up my childhood. I got pregnant at 15, had her at 16, and I tried my best with her. ... I was 15. And after I got pregnant, I went through nine months. I was in the hospital half my pregnancy .... [Ajfter Christina was born, I was basically just getting up in the mornings, in the middle of the night, five times, five times a night, and that’s the way I figured to myself, that’s how I figured I gave up my childhood, because I lost a lot of sleep. I lost a lot of things.
On May 17, 1996, the district court filed the order terminating Marla’s parental rights. The court found that “beyond any doubt” Marla is presently and in the foreseeable future unable to care for Christina, lacks parental skills, and cannot provide a stable home. The court concluded that “beyond all doubt” Marla abandoned Christina, by providing no monetary or emotional support. The court also concluded that “more than clear and convincing evidence” established that Marla abused and neglected Christina by placing her in an unsanitary and dangerous environment. The court specifically pointed out that Marla is immature, selfish, and indifferent. It also found that termination is in Christina’s best interest because “ ‘the continuing needs of a child for proper physical, mental, and emotional growth and development . . .’ are not, and will not, be met by Marla.” See NRS 128.005(2)(c). The court also pointed out that Marla seems to resent Christina more than love her. Finally, the district court stated that “Christina needs parenting now, and should not defer her needs until Marla decides she wants to be a parent.” On June 14, 1996, Marla filed a notice of appeal.

DISCUSSION

Termination of parental rights requires satisfaction of two grounds: jurisdictional and dispositional. Champagne v. Welfare *1197 Division, 100 Nev. 640, 646, 691 P.2d 849, 854 (1984). Jurisdictional grounds require that some specific fault or condition directly related to the parent be found. Id. NRS 128.105(2) sets forth the conditions as (a) abandonment; (b) neglect; (c) unfitness of the parent; (d) failure of parental adjustment; (e) risk of serious physical, mental, or emotional injury to the child if he remains with the parent; or (f) only token efforts by the parent. At least one of these conditions need exist for the jurisdiction requirement to be satisfied. NRS 128.105(2). Dispositional grounds require an evaluation of the child’s best interest. Champagne, 100 Nev. at 646, 691 P.2d at 854. Clear and convincing evidence of these two grounds must exist to terminate a parent’s rights. Id. at 648, 691 P.2d at 854.

Jurisdictional grounds

The district court found that jurisdictional grounds to terminate Marla’s rights were abandonment, abuse, neglect, failure of parental adjustment, and only token efforts. The judge also specifically pointed out that Marla lacks basic parenting skills and is unable to provide care for Christina.
With regard to abuse and neglect, Marla argues that since Christina had been in DCFS’s custody since March 1994, Marla could not have abused or neglected her during that period of time. However, Marla offers no argument to dispute whether she abused and neglected Christina when she was in her care, or whether Marla would not abuse or neglect her child in the future if her rights are not terminated.
After a thorough review of the facts in the record, we conclude that the district court did not abuse its discretion by finding clear and convincing evidence of abuse and neglect.
With regard to the failure of parental adjustment, Marla’s only allegation against this ground is that “the [DCFS] wants to terminate their [custody] case because they are frustrated by dealing with an immature teenager who will not do what she is told and the desire to punish her for her disobedience.” (Emphasis added.) Marla does not dispute that she has failed to comply with her case plan; rather, she admits it in the previous quote from her appellate brief.
We conclude that the district court did not err in finding failure of parental adjustment, as Marla never accomplished one goal in either of her homemaking contracts or the case plan. Additionally, Marla would not follow through on any task for which DCFS provided her with assistance. This includes attending an appointment with welfare to receive ADC, Medicaid, and prenatal care.
In her brief, Marla does not dispute, nor even mention, the abandonment ground or the “token efforts” ground. She instead *1198 argues that DCFS did not put forth enough reasonable efforts to help Marla comply with her case plan. Marla states that the only efforts by DCFS were the “two brief periods of homemaker intervention.” She then argues that in light of the fact that she is immature, only sixteen years old, and comes from a dysfunctional family, DCFS’s services were inadequate.
Martin and Hutchinson both testified as to the efforts they put forward in helping Marla comply with her case plan. They testified that Marla had a very short attention span and would never finish anything she started. Hutchinson also testified that she has worked with other sixteen-year-old mothers who put forth reasonable efforts to take care of their babies; therefore, Marla’s age should not be an excuse.
Accordingly, we conclude that the court could reasonably have found clear and convincing evidence that jurisdictional grounds exist.

Dispositional grounds

The district court found that Christina’s best interests requires termination of Marla’s parental rights. Specifically, the court stated that Marla is unable or unwilling to provide for Christina’s needs for physical, mental, and emotional development. Currently, Christina is living with her father, Terry. Both Martin and Sheila testified at trial that Terry takes good care of Christina and meets all her needs. They also testified that Christina needs to get on with her life and not live in fear that Marla is going to abduct her and leave the state, as Marla had already indicated she would do. The court found that Christina’s confusion and distress were “caused by Marla’s immaturity, selfishness, and indifference.”
Marla disputes that Christina’s best interests are served by termination of Marla’s parental rights. She argues that one day Terry, Christina’s father, may “develop significant failings that render him unfit”; therefore, Christina would became a “legally created orphan if Marla’s rights have been terminated.” However, she has presented no evidence, nor even mere allegations, that Terry is not a good father or will not continue to be one in the future. On the contrary, Martin specifically testified that Terry is a good father to Christina and she has confidence that he will continue to be a good father in the future. Consequently, we are not persuaded by Marla’s argument.
Marla next argues that although she is currently too immature to be a good parent for Christina at the present time, she may one day in the future achieve the maturity necessary for parenting. According to her, if that day comes, she will want to be a good *1199 parent for Christina, who will need a mother. Therefore, she avers that there is no harm in keeping this case open for periodic review until that day comes. She alleges that it would be more harmful to terminate her rights now because then she will never have a chance in the future to be a mother to Christina.
We remain unconvinced that Marla’s immaturity should be an excuse to provide minimal efforts, at best, in being a parent to Christina. Marla bases her whole reasoning on a mere possibility that one day she might decide to be a parent. We agree with the district court that Christina needs a parent now.
Additionally, when asked at trial why her rights should not be terminated, she did NOT answer that she loves Christina or wants the chance to be a good parent. Instead, she stated that she gave up a lot of sleep and her childhood for Christina. The district court determined that resentment does not make for a good parent, either now or in the future. We agree.
Our dissenting colleague alleges that our decision in this case has added “the new ground, ‘immaturity.’ ” He bases this contention on the fact that Marla was fifteen years old when Christina was born.[2] We dispute the dissenter’s accusation that we are affirming termination of Marla’s parental rights based on her immaturity. On the contrary, her age was not a factor in our decision, nor was her level of maturity. Rather, our review of the record revealed that Marla’s conduct and behavior with respect to Christina rises to the level of clear and convincing evidence that the stated jurisdictional grounds exist and that termination is in Christina’s best interest.
Therefore, we wish to make clear that immaturity, poverty, and disability, the alleged new grounds our fellow justice points out in his dissent, are not factors for our decision in this case, nor have they been factors in other termination of parental rights cases. We understand our colleague’s concern in these tragic cases. However, we emphasize that we do not take these cases lightly.
Accordingly, we conclude that the district court did not err in finding clear and convincing evidence of the requisite jurisdictional and dispositional grounds for termination of Marla’s parental rights. Therefore, we affirm.[3]
Shearing, C. J., and Rose, J., concur.

 The record does not indicate whether Marla complied with this order.

 However, the dissenting justice does not state whether he would still dissent to this decision had Marla been an adult throughout this matter.

 The Honorable A. William Maupin, Justice, did not participate in the decision of this appeal.