Springer, J.,
dissenting:

Termination of parental rights is an extreme measure.

. . . If the “capital punishment of welfare law” must be invoked, it should be done only under the strictest of conditions as set forth in this opinion.

Champagne v. Welfare Division

100 Nev. 640, 664, 691 P. 2d 849, 865 (1984)

I dissent from the judgment terminating this father’s parental rights because it is unfair to the father and contrary to the best interests of Kevin that this father and son should have to suffer the “capital punishment of welfare law” merely because the father-son relationship was temporarily disrupted by an ongoing dispute involving Kevin’s father and mother and Kevin’s present stepfather.
There are neither jurisdictional nor dispositional grounds for termination of parental rights in this case. Greeson most certainly did not “abandon” his son; and it cannot possibly be said under any version of the facts of this case that “under no reasonable circumstances [can] the child’s best interest ... be served by sustaining the parental tie.” Champagne, 100 Nev. at 652, 691 P.2d at 858.

*1206
JURISDICTIONAL GROUNDS

For the trial court to have concluded that Greeson abandoned his son it must have found that this father’s conduct “evince[d] a settled purpose ... to forego all parental custody and relinquish all claims to the child.” NRS 128.012(1). There is not the slightest bit of evidence in this case that the father intended to give up his custody rights, much less to “relinquish all claims to the child.” If this father had any “settled purpose” at all in these proceedings, it was to try to maintain his father-child relationship under the most trying of circumstances.[1]
*1207 This is not an abandonment case.[2] This is a case in which an absent father failed for a period of time to pay child support for a child that was being turned away from him by the child’s mother and stepfather and the mother’s family. For some period of time, at least, Greeson was not permitted to see his son. Ms. Barnes’ father testified that when Greeson attempted to visit Kevin, he “a time or two, run him oif. . . because I didn’t like his attitude.” In a situation like this one, where the father was “run off” from his visitation attempts, it is very difficult indeed for me to understand how the trial court could possibly have decreed that this father is to be lost forever from this son. There is no evidence of abandonment in this case, and I believe the error of the trial court in this matter to be violative of the constitutional limits on parental severance set forth in Santosky v. Kramer, 455 U.S. 745 (1982).
When I say that parental rights should not be terminated for failure to make timely child support payments, I am in no way condoning the unfortunately common practice of noncustodial parents’ refusing to pay child support payments because of real or perceived grievances relating to violation of their visitation rights or to claimed alienation of the child by the custodial parent. Violation of support decrees regularly calls for severe penalties, even jail sentences; still, if every time this kind of problem arises, we are going to permit the termination of the non-paying natural parent’s legal rights as a mother or father, we áre going to be wreaking a terrible disruption of the already disrupted family life in this country.[3]
*1208 It can be argued that Michael Greeson might have handled these problems with his former wife in a better way, but his becoming involved in these kinds of rather typical conflicts does not mean that he deserves to have his child taken away from him forever. He is the natural father; he has had a terrible fight with the child’s mother and her new husband; but this does not mean that he has to be deprived of his status as the father of his child, such drastic action is neither in the child’s interest nor the father’s. Termination is in no one’s best interest. The child does not deserve to have his natural father taken away from him. The child loses his rights of inheritance and his rights to the company of his father, all because of a petty and spiteful disagreement between his mother and father and because this eight-year-old child has been taught that his father is “stupid.”[4]
As I have said, this is not an abandonment case, whatever else it might be. This father did not abandon his son and does not deserve the “capital punishment” that was imposed upon him in this case. There are no jurisdictional grounds to support this termination of parental rights decree.

DISPOSITIONAL GROUNDS

Even if there were some evidence of abandonment in this case, even if this father had been clearly and convincingly proven to have had a settled purpose to get rid of Kevin, to “forego all parental custody” and voluntarily “relinquish all claims to the child,” certainly, under Champagne, there are any number of “reasonable circumstances” under which Kevin’s interests would “be served by sustaining the parental tie.”[5] There are insufficient dispositional grounds to justify this severance of parental rights.
*1209 The kinds of parental rights termination cases that we ordinarily see are cases in which it is quite apparent that the child’s interests cannot be served by sustaining the parental tie with parents who, for example, are in prison, are hopeless drug addicts or who have actually demonstrated a “settled purpose” to give up their parental rights. This is not such a case. There is nothing wrong with this father; he is not morally unsuited to be a father; he is not a bad pers'on; he is not an unfit parent. Granted, he may have done wrong in the turmoil after his divorce when he lost contact with his son and failed to make court-ordered child support payments on time. This does not provide cause for permanently taking his son away from him and never letting him see Kevin again. (Even if, for now, Kevin thinks his father is “stupid.”) Every noncustodial parent who is delinquent in child-support payments will now, it seems to me, be subject to retaliatory attempts to terminate their parental rights. Termination of parental rights is designed for cases in which there is no way in which the child’s interests can be reasonably served except by taking the offending parent out of the child’s life. Termination of parental rights is not designed as a way to punish parents who get behind in their child-support payments.
The trial judge in this case could not possibly have fairly concluded that there were no “reasonable circumstances” under which the father’s parental rights could be sustained because the judge made no inquiry into such circumstances. The issue was not even litigated. There are no dispositional grounds for termination of parental rights in this case.
In 1982,[6] the Supreme Court held in Santosky v. Kramer, 455 U.S. 745, that the interest of a natural parent was a “fundamental liberty interest,” guarded by the United States Constitution and that this “interest does not evaporate simply because [the natural parent] ha[s] not been [a] model parent[].” Id. at 753. “[T]he degree and duration of parental fault or incapacity necessary to establish grounds for termination is greater than that required for other forms of judicial intervention.” Champagne, 100 Nev. at 648, 691 P.2d at 854-55. For this court to say blandly that it is clearly convinced that this father voluntarily had a “settled purpose” to “relinquish” his rights of fatherhood, and for this court *1210 to say further that there are no reasonable alternatives to termination of parental rights is, in my opinion, a perversion of law and a perversion of nature. There are neither jurisdictional nor disposi-tional grounds here; so I would reverse the judgment of the trial court.

There are some minor conflicts in the evidence in this case, as discussed in the majority opinion, but there is certainly nothing that would even suggest that this father no longer wanted to be a father or that he wished to relinquish forever “all claims to the child.” So that the reader of this dissent will have some appreciation of the tragedy that is inherent in the present judgment of this court I will review the facts in this case. When Kevin’s mother and father got divorced in March of 1987, the father was ordered to pay $200.00 per month and was given the right to one week’s visitation each month. The decree provided for a review of the matter at the end of six months. All went well initially; Greeson paid his child support and had the child with him for one week of each month with the exception of one visitation period. The problems in this case can clearly be traced to one event: the six-month court review of custody. Greeson tried to get the review hearing postponed because his new wife was about to deliver a baby. As so often happens in these kinds of situations, communications broke down between the court and the then lawyerless father. The postponement was given by the court, and the review hearing was rescheduled; but Greeson claims he did not get notice of the rescheduled hearing. The hearing went ahead in Greeson’s absence. Greeson was later advised by the petitioner that at the hearing his visitation rights had been reduced from one week a month to every other weekend. Greeson never received a copy of the new custody order. Greeson exercised the new, diminished visitation rights on a regular basis until struck in the form of a huge verbal battle between Kevin’s mother and Greeson’s wife. The gist of the aftermath of this contretemps was that the mother would not let the father see his child for so long as he insisted on keeping his wife around. Greeson tried to avoid this restriction imposed on his visitation rights by arranging his now bi-monthly visitations with his son at the home of his parents, the child’s grandparents; but the child’s mother eventually told the paternal grandparents that she would not allow the child to visit with the grandparents if Greeson was going to be there.
After the mentioned review hearing in which the new visitation orders were made, Greeson got behind in his child support payments. Greeson testified that this was due to a job-related injury which finally forced him to go onto welfare. He testified that, at the time, he was receiving under three hundred dollars a month. Greeson testified that he could not afford an attorney and did not know how to go about getting his support payments reduced and that he became very frustrated by the difficulties in visitation occasioned by his former wife and her husband and father. Ultimately, the mother refused to let Greeson see his son until he caught up with all of his child support payments.
Even if we take the dimmest view of this father’s conduct and the charged neglect (not “abandonment”) of his son during the post-divorce disruption of *1207 his life, there is no evidence at all, much less “clear and convincing evidence” that he abandoned his son, that he had formed a “settled purpose” or intention to forego all custody rights and voluntarily and purposefully “relinquish all [parental] claims to his son.”

There is some evidence in this case of Greeson’s neglect of his son during this tumultuous period mentioned in footnote 1. There is not, however, such neglect as to justify termination of Greeson’s parental rights. The pleading in this case avers that Kevin was “neglected within the purview of NRS 128.012” and charges that Greeson had “failed, neglected and refused to provide proper and necessary subsistence” for the child. I stress, however, that this case proceeded on a theory of abandonment — intentional and purposeful “relinquishment” of parental rights by a parent.
It appears to me that the majority realizes that there was no evidence of abandonment and that to sustain the judgment of the trial court, it had to rely on the presumption contained in NRS 128.012, which relates to proof in welfare cases in which the abandoning parent makes no “provision for the child’s support” and where there is no “communication for a period of six months.” The statute has no application in a case such as this where provision for the child’s support was made in the divorce decree and where the parents and child were certainly not incommunicado.

Nevada provides any number of remedies that an aggrieved parent and child can use to enforce child support obligations, including garnishment *1208 proceedings, withholding of industrial insurance benefits or unemployment compensation, assignment of income, and even civil contempt proceedings. See, e.g., NRS Chapter 31A; NRS 31.295; NRS 616.550; NRS 612.457. These alternatives should have been explored before “capital punishment” was imposed.

To me the most revealing evidence of the pattern of conduct of the mother and the stepfather comes to light in the testimony of the child advocate. The child told the child advocate that he did not want to see his father, “because he was stupid.” This tells me a lot about what was done to this child in the absence of his father. Young children would not ordinarily be expected to tell strangers that their fathers were “stupid,” absent some coaching or improper influence of some other adult. When asked whether he felt that the hostility of the mother and stepfather towards Mr. Greeson may have interfered with the contacts which Kevin had with his father, the child advocate answered, “Yes, I do.” The child advocate also testified that. “[b]oth Toni and Jack Barnes have been very hostile toward Mike [Greeson], My assumption is that Kevin would pick up on that.”

The idea of permanent severance of the natural “parental tie” in this case is totally out of line with the “dispositional” requirement of Champagne. *1209 Before termination was adjudicated in this case, certainly some consideration should have been given to “reasonable circumstances” under which the “child’s best interest” can be served and to ways in which some visitation rights could be exercised by the father; and even if this were not the case, there is no need to terminate his legal rights of fatherhood.

I would note that all of the cases cited in the majority to support the termination order in this case were decided before 1982, which is to say before Santosky and before Champagne. These cases have no bearing on the case now before us.