Springer, J.,
dissenting:
The State permanently deprived a mentally handicapped mother and father of “the right of love and association” with their two children, because of the “genetic or physical limitations” suffered by these parents. (Trial Court’s Decision, October 19, 1994). The Bushes have lost their children because the courts have concluded that they are “incapable of obtaining the *1308 skills” in parenting that parents must now possess in order to avoid the threat of having the State take away their children and give them to new, more skillful parents.
This case is one of a number of termination cases in a spate of cases in which poor and handicapped parents have lost their children to substitute parents because of a supposed lack of parenting skills and because the “best interests” of their children is supposedly being served by presenting them with a new and better set of parents.
I am not sure what causes can be attributed to these onslaughts on the poor and the handicapped, but it seems to me that they can be traced to the 1987 amendment of NRS 128.105, in which a provision was added to the termination statute, stating that the “primary consideration in any proceeding to terminate parental rights must be whether the best interests of the child will be served by the termination.” As I see the various cases now coming before this court in which children of the poor, sick and powerless are almost routinely being taken from their natural parents and permanently given to more talented parents, I get the feeling that agents of the State have misinterpreted the statutory “best interests” addition to authorize a much greater intrusion into Nevada families.
Those who believe that the “best interests” amendment gives greater powers to the State in permanently depriving natural parents of their parental rights and bestowing those rights on more “skillful” parents are, of course, wrong. The “primary consideration” in termination cases is and always has been the “best interests of the child.” It just cannot be the only consideration.
Even before Champagne v. Welfare Division, 100 Nev. 640, 691 P.2d 849 (1984), this court recognized the “ ‘dominant purpose of serving the best interests of the child.’ ” Chapman v. Chapman, 96 Nev. 290, 292, 607 P.2d 1141, 1143 (1980) (quoting NRS 128.090). It is certainly appropriate for the courts to consider the interest of the child as a “primary consideration,” so long as, in doing so, they do not ignore the constitutional rights of the parents, as this court appears to have done in the present case. As we noted in Champagne-.
We agree that children’s interests should be paramount; but their interests cannot displace established liberty interests of natural parents. Children cannot be taken from poor parents and placed permanently in the home of substitute parents simply because their “emotional needs” would be better served or because they might have a cleaner, neater, or richer environment.
100 Nev. at 649 n.6, 691 P.2d at 856.
*1309 Whether the increase in the number of cases involving the termination of parental rights of the poor and handicapped is caused by a misreading of the “best interests” amendment of NRS 128.105 or by some other reasons, a certain pattern of cases is quite obviously on the increase. Here is the pattern:
Poor or handicapped parents are having trouble raising their children. The kinds of problems that these parents have are too legion to catalogue, but the common result is that the State removes the children from the home “temporarily.” Almost always this is done by court order on a petition unopposed by the poor family, primarily because they do not have counsel.
Welfare imposes upon the parents a “reunification” plan that is supposed to be designed to get the children back into their home. In many cases the problems of poverty, mental or physical incapacity and other difficulties that brought about the family separation stand in the way of the parents’ satisfactory compliance with the “reunification” plan.
The children are placed in the home of substitute parents, parents who are usually in a much better position to provide a “nicer” and more “nurturing” home environment. The natural parents visitation becomes more and more difficult and awkward. The children (naturally) “bond” and “integrate” with their substitute parents.
Welfare gives notice to the natural parents that they have flunked the reunification test, that their children are better off in their new home and that the natural parents must say “goodbye” forever to their children.
The parents get notice of the termination hearing. They finally, too late, get an attorney appointed to defend against the State. They lose their case. The children have a new set of parents. The natural parents have nothing.
Having described the pattern that I am perceiving in the cases now coming before the court, I want, before proceeding, to say that I do not intend this dissent to be an indictment of welfare workers. What they are doing, they believe, I am sure, to be the proper, legal and moral thing to do. If I were to attribute any fault to what is happening, I would attribute that fault to this court, which refuses to give needed guidance to welfare officials by refusing to declare the statutory and constitutional limits upon the kinds of activities that I have described.
I want to say further that I fully realize that there are many cases in which children live in the homes of abusive and unfit parents and that, once removed, they probably should never go back. I also want to make it clear that I fully understand the *1310 “damned-if-you-do-damned-if-you-don’t” dilemma that Welfare officials are placed in. One voice is telling them to try to “reunify” the family and place the children back in the home. Another voice is warning them that the children will be permanently injured, physically or developmentally, if they are permitted to be raised by abusive or neglectful natural parents. In most cases, Welfare case workers make the best of very difficult situations; and, having some familiarity with their trying work, I want to say that they have my highest respect and admiration.
In the case now before the court, however, it appears to me that the Welfare Division initiated and carried out termination of parental rights proceedings solely because the parents were mentally handicapped. This is wrong. It also appears to me that the termination of parental rights in this case was probably principally motivated by the reality that the substitute home was a better home than the home that could be provided to the children by their handicapped parents. For reasons that I will explain in this dissent, I am very much concerned about prevalent social engineering theories that promote the permanent termination of parental rights of faltering and “inadequate” natural parents based on the assumption that placement of children in a “better” home will necessarily serve the children’s “best interests.” I am opposed to any social or legal theory that promotes the severance of parental ties just because the children (naturally and understandably) appear to have “become integrated” in a new, perhaps more amiable, home situation.
At the time of the termination decree which ended the Bush’s parental relationship with their children, the children were six and seven years old. The reasons given by the trial court for severing the parental ties were that the Bushes were “unfit parents” and that they had “failed to adjust to become proper parents within a reasonable period of time.” At the time the termination proceedings began, the Bushes had been involuntarily separated from their children for a period of almost five years.
According to the trial court, Mr. and Mrs. Bush suffer from “reduced mental capabilities” (IQ’s of 65 and 71) and are “incapable of obtaining the skills necessary for [the] reunification” that would allow the Bushes to raise their children. (Emphasis added.) The trial court concluded that although there may have been a “technical compliance” with the Welfare Division’s “Case Plan,” “the lessons are not being learned and practiced by Mr. and Mrs. Bush.” (Emphasis added.)
After the State took the Bushes’ children out of their home, the Bushes continued to try for a long time to do what was expected of them to get their children back. According to the trial court, they did “make significant efforts to gain the education and skills *1311 necessary to raise their children.” The trial court observed that failures on the part of the Bushes to meet standards imposed upon them by the Welfare Division “may very well have arisen from the Bush’s inability to succeed” and then concluded that the Bushes could “never be able to reach a level sufficient to meet the physical and emotional needs of their children.” (Emphasis in original.)
The trial court concluded that “[e]ven when [the parents] have been willing, they have failed to assimilate and practice the lessons being taught” and that it is “more likely” that the Bushes are “incapable of correcting the conditions that led to the removal of the children.”[1]
Put plainly, this is not a case of parental fault, it is a case of faultless parental mental incapacity. The trial court concluded that no matter how hard they tried, the Bushes did not have sufficient intelligence to be entrusted with raising their children. The trial court concluded in its “Statement of Law” that the “result is the same regardless of whether the issue is the parent’s inability or unwillingness,” which is to say that it does not matter whether the Bushes were handicapped or recalcitrant. I think the question of fault or incapacity matters a great deal, and I am of the view that this court’s refusal to deal with the question of fault versus incapacity in termination cases is an inexcusable dereliction on its part.
The leading case in Nevada in this area of the law, the Champagne case, gives no appreciable guidance as to when it is justified for the family court to terminate the parental rights of parents who are, faultlessly, physically or mentally handicapped. 100 Nev. 640, 691 P.2d 849 (1984). I do not blame the district judge for arriving at a legally incorrect decision in this case, as he had no real precedential guidance on this vital subject. As I have said, my reading of the record tells me that the district judge did a very thorough and thoughtful job in dealing with this difficult and troubling case. I wish I could say the same for this court, which has decided the case superficially and has not even touched on the momentous issues presented by this controversy.
Let me now look a little more deeply into how it came about that the State permanently denied two loving but mentally handicapped parents of (as it was put by the trial judge) “the right of love and association with their children, especially when the *1312 inability to care for the children may arise from genetic or physical limitations.”
There can be no question that the Bushes were far from being model parents and that they were having difficulties raising their children. Not surprisingly, the children of these two mentally deficient parents were, themselves, “developmentally delayed.” When the Welfare Division filed its child-neglect petition it did not mention the single most significant aspect of this case, the parents’ handicap. The petition stated, as grounds for the petition, only “marital discord,” “family income irresponsibility” and the children’s “developmental delays.”
The Bushes do have very limited reading and writing skills, and it is extremely unlikely that they understood the nature of the proceeding or the dire consequences that eventually followed the filing of the petition. When the petition that resulted in their having their children removed from their home was first brought to court, they did not have an attorney, and they did not, consequently, file any legal opposition to the petition. These undefended proceedings not only resulted in the removal of their children from their home, but the court action taken in these proceedings was the primary cause of the eventual, permanent termination of their parental rights.[2] The children were removed from the home on August 4, 1989, when one was two years old, and the other was 10 months old. That was the end of the Bush family.
At some point during the Bushes’ attempt to get their children back, an “independent living specialist” from the Nevada Association for the Handicapped became involved and put the Bushes into a program the sensible purpose of which was (as stated in the trial court’s Decision) “to provide ‘incremental goals’ to avoid overwhelming the parents.”
In September of 1992, after the children had been separated from their parents for over three years, a Welfare Division worker reported to the court that (according to the trial court’s Decision in this matter) “the parents were making every attempt possible and that the children would be a handful even to high *1313 functioning parents.” The worker recommended “long-term foster care but not termination of parental rights.” (Emphasis in original court Decision.)
In November of 1993, the Welfare Division’s position changed. For reasons that do not appear in the record, the Nevada Association for the Handicapped had discontinued its program, and the Bushes’ attempt to regain their children lost some of its thrust. An inimical CASA volunteer “continued to assert that the Bush’s were not capable of giving the children a permanent home.” (Emphasis added.) At this time the Welfare Division recommended the institution of termination of parental rights proceedings. Termination proceedings were filed by the Welfare Division on June 17, 1994. With regard to these proceedings, I must agree with the Bushes’ attorney, who wrote in his Pretrial Memorandum that “[t]his case evolves solely from the mental deficiencies of Rosemary and Allen Bush.”
None of the consolidated cases dealt with in Champagne involved permanently depriving faultless, handicapped persons of their children; but Champagne does make reference to the possibility that permanent parental severance might be justified in no-fault cases of “incapacity” and cases in which there is an “irremediable inability to function” as a parent. 100 Nev. at 648 n.5, 691 P.2d at 855. The question of terminating parental rights in cases of faultlessly incapacitated or handicapped persons is an open question and a serious question that was mentioned but not discussed or decided in Champagne. Strangely, the majority does not cite or refer to Champagne and merely relies on NRS 128.106 which states that in determining the neglect or unfitness of a parent, the court “shall consider” the “mental deficiency of the parent which renders the parent consistently unable to care for the immediate and continuing physical or psychological needs of the child for extended periods of time.” The mentioned statute does not, of course, mandate the termination of parental rights of “intellectually challenged” parents and merely provides that the court must consider disabling mental deficiency as one factor in the determination of the jurisdictional ground of parental unfitness. As to when, if ever, mental deficiency can be the sole ground for parental severance, the legislation is silent. It is certainly arguable that parents should never lose their children just because the parents have a low I.Q. This is a subject that most certainly should have been addressed by the majority before affirming the judgment of the trial court. It was not.
The question of when, if ever, it is proper to take incapacitated or handicapped parents’ children away from them is a chilling one. I wonder what the attitude of the majority would be if a physical deficiency, say quadriplegia, had rendered the Bushes *1314 unable to “reach the level of sufficiency to meet the physical and emotional needs of their children.” I wonder if, in the minds of the majority justices, mental deficiency is considered to be any more or less disabling than physical deficiency. I wonder how a sensitive and thoughtful majority would apply the standard of “irremediable inability to function” as a parent to the facts of this case. I tend to question, even under the “irremediable inability” language of Champagne, whether it is ever morally or constitutionally permissible to terminate the parental rights of a fault-free parent.[3]
I am not, under the present circumstances, obliged, as a minority jurist, to undertake an answer to these questions. This is the duty of the majority. I do know, however, that until these and other related questions are answered, the majority has no business concluding that there are jurisdictional grounds for permanently depriving the handicapped Bushes of their children.
This is a profound and troubling case. With regard to the jurisdictional grounds of “unfitness” and “failure to adjust,” relied upon by the trial court, this appellate court is not presently in a position to decide whether these grounds have been proven by clear and convincing evidence. I say this because the majority has not attempted to apply any articulated principles of law to the particular circumstances of this case.[4] My first ground for dis *1315 sent, then, is that the jurisdictional grounds of unfitness and failure to adjust have not been adequately defined in the majority opinion for cases involving innocently handicapped parents and that, consequently, these grounds cannot possibly have been established (clearly, convincingly or otherwise) as jurisdictional grounds for termination.
I next address the questions relating to the so-called “disposi-tional grounds” in this case. The focus of dispositional grounds is “the welfare of the child.” Champagne, 100 Nev. at 653, 691 P.2d at 858. In the decision of the trial court, recognizing the holding in Champagne, the district judge properly noted that dispositional grounds exist only “if under no reasonable circumstances the child’s best interest can be served by sustaining the parental tie.” This strict rule, obviously, is a far cry from saying that a child would be better off in Home A than he would be in Home B and that he should, therefore, be permanently placed in Home A, with his natural parental ties being permanently cut off.
As I read this record, I see that the Welfare Division has done a remarkably good job in finding foster parents who are willing to adopt these “developmentally delayed” children. The children have been with the foster parents going on five years; and the children, the trial court tells us, have “bonded” with the foster parents. It is hard to deny that at the present time the children would probably be better off staying in the foster home than *1316 placing them abruptly back into the now-alien home of the natural parents. But, I am not urging an immediate transfer of custody. I only question the propriety of permanent severance of parental ties. My point is that I believe that in this case there are reasonable circumstances under which the children’s interest could be served by sustaining the parental ties and that, consequently, the requirement of dispositional grounds has not been met.
I do not think that it can be safely said that there are no reasonable circumstances which would permit maintaining the Bushes’ parental relationship. Early on, shortly after the children were placed in foster care, the assigned welfare worker opined, in April of 1993, that the best interests of the child would be served by long-term foster care rather than termination of parental rights. The option of long-term foster care provides such a “reasonable circumstance”; and it is certainly an option that should have been considered in April 1993 and should have been considered by the trial court in this case.
Sadly enough, it appears to me likely that it is now the policy of the State to take children away from “inadequate” parents (see footnote 5) and find them a better home and to use the “best interests of the child” as the sole, criterion in determining whether to pursue a termination of parental rights action. Many of us today would not have been allowed to remain with our parents if the only basis for permanently taking us away from our parents was that there were some better parents around the corner.
In Champagne we held that the “[severance of parental rights is an exercise of awesome power, a power which we ‘question closely,’ ” id. at 645, 691 P.2d at 853 (citation omitted) and explained that there are constitutional and “ ‘fundamental liberty interests of the natural parents in the care, custody and management of their child,’ ” id. at 647, 691 P.2d at 854 (quoting Santosky v. Kramer, 455 U.S. 745, 753 (1982)). These fundamental interests, we declared, quoting Santosky, do “ ‘not evaporate simply because they have not been model parents or have lost temporary custody of the child to the State.’ ” Id. at 647, 691 P.2d at 854 (quoting Santosky, 455 U.S. at 753). We have here a rather typical example of parents who are not “model parents” and who probably can fairly be described as “inadequate” parents.[5]
*1317 The predominant reason that I can see in this record that the trial court took the Bushes’ children away from them permanently was that the court saw the children as being better off in the foster *1318 home than they would have been in their own home. The termination decision appears to have been based on a determination that the foster home was now the better of the two possible homes for the children.
In Champagne, we decried the application of a rule which based the termination decision on such factors as whether the child “has become integrated”[6] into a foster family. Id. at 650 n.6, 691 P.2d at 856 (quoting NRS 128.108). To terminate parental rights in this case is to accept the unproved dogma of those psychiatrists who see the best interests of the child as the sole determining factor in termination cases and who would have the courts decide the question of parental severance based on an odious comparison between the real parents and the foster parents “to see who can best give the child love, affection and guidance and to continue the education of the child . . . and who has the capacity ... to provide the child with food, clothing and medical care . . . [and the] moral fitness, physical and mental health.” Id. A “foster parent who has established a relationship with a child would take precedence over a natural parent, even if the natural parent has lost custody of the child through no fault of his own.” Id. at 649 n.6, 691 P.2d at 856. Under such a theory, if a child who has been removed from her home had been “temporarily” placed in the home of Daddy Warbucks, the natural parents would have had it. Daddy Warbucks can surely provide better food, clothing and housing and presumably can do a better job in affording “guidance and to continue the education of the child” who has been removed from a home because of “neglect” or some other parental failing; still, we cannot properly base a decision to terminate parental rights on a judgment as to whether a child is better off with his parents or in some richer environment in the home of some “surrogate” parents.
The point that I make is that we should not, morally or constitutionally, simply put the child on the scale and weigh to see which, the natural or the replacement parent, will better serve the “best interests of the child.” The parents in this case have a low I.Q. and have had a terrible time trying to jump through all of the hoops that the Welfare Division introduced as a condition to *1319 their keeping their children. The Bushes have satisfactorily raised another child, and it seems to me that it is reasonable to conclude that with a little more help and a little more patience, the Bushes could have raised their now-lost children.
The more extreme of those jurists and social engineers who support “best interests” as the sole decisional criterion for permanently severing parental ties with children who have “bonded” and “integrated” with replacement parents would apply a simple weighing test in which the question is asked: “In which of the two homes would the best interests of the child be served?” Champagne was a repudiation of such a weighing approach. This court recognized in Champagne that “[termination of parental rights is essentially, of course, a statutory proceeding; but the statute does not say it all. Overlying constitutional considerations,” 100 Nev. at 663, 691 P.2d at 864, must be taken into account; thus, there must be either a showing that a parent is “unsuitable” by reason of having been guilty of such “persistent fault or state of incapacity” as to deserve to have his or her parental rights terminated or that the parent has “sacrifice[d] parental rights in the interest of the child, by reason of irremediable inability to function as a proper and acceptable parent,” id. at 648 n.5, 691 P.2d at 858. This is the first time that this court has had an opportunity to examine and discuss this kind of “sacrifice” of parenthood. In refusing to do so it does a disservice to faultlessly incapacitated parents such as the Bushes and to other similarly situated handicapped parents who are threatened in the future.
This is a case in which the decree terminating the Bushes’ parental rights decree should be reversed; therefore I dissent.

There is some evidence in the record that the Bushes were at times frustrated, uncooperative and even “hostile” to State officials; but, overall, it is quite clear that the court rested its decision on the Bushes’ inability to become adequate parents rather than on any fault or willful misconduct or derelictions on their part.

As I see it, the Bushes’ incapacities and their not having an attorney during the neglect proceedings when their children were first taken away from them is far more important than their having an attorney at the termination hearing. By the time of the termination hearing they had already lost the game. Their children had been able to see them only briefly on fairly infrequent occasions, and the children, naturally (to use psychiatric jargon) “bonded” with their foster parents. Every day that the children were out of the Bush home made it more difficult for the supposed desideratum, “reunification,” to take place. If these parents had had a truly dedicated attorney or a CASA volunteer who was something other than a surrogate agent for the State, this would, in my opinion, have been an entirely different case.

The recent court cases involving misidentified babies who are inadvertently “switched” at birth comes to mind. It occurs to me that when a natural parent comes to court ten or fifteen years after the unfortunate switch, seeking return of her or his natural child, the court might properly and morally decide that, innocent or not, such a parent should not be entitled to the return of her or his child and that perhaps termination of parental rights of that faultless parent, rather than removal of the child from the parents who raised the child, might be in order, solely because at that point in time the best interest of the child might demand that the “wrong” parent be awarded legal parenthood. Also, perhaps it might be at least thinkable to consider terminating the parental rights of a parent who was in an irreversible comatose and vegetative state, if it was very clearly and convincingly necessary and in the best interests of a child to do so. I footnote these kinds of situations because it seems to me that only in the rarest and most unusual of cases (if ever) would it be morally proper to terminate the parental rights of an innocently incapacitated or handicapped parent who was begging the court not to terminate parental rights. Certainly I would want to resist the severance of parental ties of any parent who was having trouble raising a child because of a handicap, especially when the parent was earnestly trying to avert the “capital punishment” of welfare law. As appears from the position that I take in the text, I would vote “no” on the question of whether “unfitness” of the Bushes was established by clear and convincing evidence.

I agree, incidentally, with the majority’s view that the “evidence supporting both parental unfitness and parental failure to adjust is essentially the same in this case.” The question in this case boils down to whether an “inability” to conform to the parenting plan laid down by the Welfare Division can support a conclusion of either parental unfitness or parental *1315 failure to adjust. I have a particular problem in this case with the failure-to-adjust jurisdictional ground. As we pointed out in Champagne, the “idea of permanently taking a child from a parent by reason of the parent’s failing to adjust to ‘circumstances, conduct or conditions’ prescribed by the state is an idea that is new to public family law.” 100 Nev. at 651, 691 P.2d at 857. Caution in such cases is necessary
because of the vast power differential between the state and the welfare client, the paucity of truly efficacious ‘services’ that are or can be made available to the client, the usually greatly diminished contact between welfare client-parents and the removed child and the oft-seen ineptitude of the so-called ‘inadequate’ parent.

Id.

Significantly, in Champagne, we noted that “[fjailure of parental adjustment may provide a jurisdictional basis for termination, but it is fraught with difficulties and must be applied with caution.” Id. at 652, 691 P.2d at 857. I find no such caution to have been exercised in this case. I find a certain degree of impatience on the part of agents of the Welfare Division, and I find as the principle motivating force behind Welfare decisions in this case to be a desire to place the children in a better home than they had in the home of their poor and intellectually limited parents. This is not the kind of caution that Champagne was talking about. Champagne teaches that the courts should be cautious not to take children away from their natural parents absent a clear showing of “fault or incapacitation.” Id. at 651, 691 P.2d at 857. What means “incapacitation” is the center of this controversy and a subject that is not even mentioned in the majority opinion.

The term “inadequate” seems to me to describe the Bushes fairly accurately. Footnote 7 in Champagne poignantly describes these kinds of parents and argues that such parents do not deserve to lose their children. The footnote bears repeating, in part, in this dissenting opinion:
While no empirical studies provide a statistical breakdown of the reasons for intervention in neglect cases, probably the largest category of cases involves persons thought to be “inadequate parents.” All *1317 commentators agree that the great majority of neglect cases involve very poor families who are usually receiving welfare. Most of the parents are not merely poor, however. In addition to the problems directly caused by the poverty . . . many of these parents can be described as extremely “marginal” people, that is they are continually at the borderline of being able to sustain themselves — economically, emotionally, and mentally.
Their plight is reflected in their home situations. Their homes are often dirty and run-down. Feeding arrangements are haphazard. One or both parents may ... be retarded, which may affect the quality of their child care. . . .
Such parents may provide little emotional support for their children. While the children may not be physically abused, left unattended, dangerously malnourished, or overtly rejected, they may receive little love, attention, stimulation, or emotional involvement. . . .
It is certainly very tempting to intervene to help such children. Intervention might be justified both to protect the children by providing them with an environment in which they can better reach their potential and to protect the state, since it is claimed that such children will probably end up as delinquents, criminals, or welfare recipients. Without intervention, we may be perpetuating a “culture of poverty.”
Despite the appeal of these arguments, parental “inadequacy” in and of itself should not be a basis for intervention, other than the offer of services available on a truly voluntary basis. The term “inadequate home” or “inadequate parent” is even harder to define than emotional neglect. There is certainly no consensus about what types of “inadequate” behavior would justify intervention. Given the vagueness of the standard, almost unlimited intervention would be possible.
.... In fact, by focusing solely on parental behavior, child-care workers often ignore the many strengths a given child may be deriving from his environment. As I have stressed, the complexity of the process by which a child relates to any environment defies any attempt to draft laws solely in terms of environmental influences.
Moreover, there is every reason to be extremely pessimistic about the utility of coercive intervention. The services necessary to help these families are generally unavailable. More day-care centers, homemakers, health facilities, and job training programs would all be needed if intervention were to mean anything more than periodic visits by a social worker. Such visits themselves are costly, have not been shown to be effective, and may be resented by the parent who will blame the child for the outside meddling.
Even when “inadequate” parents seek help, agencies often lack the resources or ability to alleviate undesirable home conditions. The chances of success are even lower when the family resists intervention. Few communities have sufficient personnel and programs to permit meaningful intervention, even in cases involving physical abuse or severe emotional damage. It is highly questionable whether limited resources ought to be expended on families with less severe problems, unless the families request services or accept them voluntarily.
Furthermore, when parents do not respond to the “treater,” the next step is to remove the children. Yet there is no evidence demonstrating that children from such families are helped through placement.
In an ideal world, children would not be brought up in “inadequate” *1318 homes. However, our less than ideal society lacks the ability to provide better alternatives for these children. The best we can do is to expand the social welfare services now offered families on a voluntary basis.
Champagne, 100 Nev. at 654 n.7, 691 P.2d at 858.

I note that NRS 128.108 requires the court to “consider whether the child has become integrated into the foster family” and the “capacity and disposition of the child’s parents from whom the child was removed as compared with that of the foster family to provide the child with food, clothing” and all the many other goodies that the child was probably deprived of to some extent in his natural but “inadequate” parental home. {See footnote 5).