IN THE COURT OF APPEALS OF THE STATE OF IDAHO
Docket No. 49399

| In the Interest of: John Doe I, A Child Under Eighteen (18) Years of Age. | ) | |
|---|---|---|
| STATE OF IDAHO, DEPARTMENT OF HEALTH AND WELFARE, | ) ) ) | Filed: April 28, 2022 |
| | ) | |
| Petitioner-Respondent, | ) | Melanie Gagnepain, Clerk |
| | ) | |
| v. | ) ) | THIS IS AN UNPUBLISHED OPINION AND SHALL NOT |
| JANE DOE (2022-02), | ) ) | BE CITED AS AUTHORITY |
| | ) | |
| Respondent-Appellant. | ) | |
| | ) | |

Appeal from the Magistrate Division of the District Court of the Second Judicial District, State of Idaho, Nez Perce County. Hon. Victoria Olds, Magistrate.

Judgment terminating parental rights, affirmed.

Joanna M. McFarland, Lewiston, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Floyd L. Swanton Jr., Deputy Attorney General, Boise, for respondent. Floyd L. Swanton Jr., argued.

Paige M. Nolta, Lewiston, guardian ad litem.

_____

BRAILSFORD, Judge

Jane Doe (Mother) appeals from the magistrate court's judgment terminating her parental rights to her minor child, J.D. Mother argues the court erred by concluding she neglected J.D. and that the termination of her parental rights is in J.D.'s best interests. She also challenges several orders the court entered during the underlying Child Protective Act (CPA) case before the court terminated her parental rights. We affirm the judgment terminating Mother's parental rights but decline to consider Mother's appellate challenges to the court's orders entered in the underlying CPA case.

1

# I.

## FACTUAL AND PROCEDURAL BACKGROUND

In March 2014, Mother gave birth to J.D.[1]  At that time, Mother was in Lewiston; unmarried; and in a relationship with a sex offender, who was not J.D.'s father.[2]  Shortly after J.D.'s birth, the Idaho Department of Health and Welfare opened a voluntary case plan for Mother based on concerns about her mental health, inappropriate housing, and inability to care for J.D. That plan remained in place until about January 2015.

According to Mother's testimony at the termination hearing, when J.D. was "around two or three years old," he began having "tantrums" due to "frustration" and "anger," and she had his mental health evaluated.  Also during this timeframe, Mother married a man in December 2016 but divorced him within a "couple" of months.  Then, in April 2017, Mother gave birth to twins, although the twins were not the children of the man Mother had married in December 2016 and subsequently divorced.

Shortly after the twins' birth in April 2017, the Department received a report in May 2017 that Mother was locking J.D. in his room and that he had bruising on his legs.  During an investigation of this report, Mother stated she was "overwhelmed" and "didn't know what to do with [J.D.]."  Following the investigation, the Department sought protective supervision of J.D. and his younger twin siblings.  Eventually, the State charged Mother with injury to child; Mother pled guilty to disturbing the peace; and the magistrate court granted the Department's request for protective supervision of the children.  The Department's protective supervision concluded in approximately February 2018.  During this time, Mother received services to improve her parenting skills.

In October 2018, Mother gave birth to a daughter, and in December 2018, she married the daughter's father.  A few months later, in April 2019, when J.D. was five years old, Mother took him to the emergency room "with a chief complaint of hyperactive behavior."  According to the

---

[1]  Mother had given birth to two children before the birth of J.D.  When Mother was nineteen years old, however, the children's maternal grandmother obtained a guardianship over them, and at the time of the termination trial, Mother did not have custody of those two older children, who remained in their maternal grandmother's custody in New Hampshire.

[2]  At J.D.'s birth, Mother was mistaken about the identity of his father, and Mother did not learn the father's identity until later.  The magistrate court terminated the parental rights of J.D.'s father, but that termination is not the subject of this case.

2

emergency room physician, Mother reported that J.D. was locked in his room because "it was not time for him to come out" and "he had hit his head against a pane of glass in his bedroom, cracking the glass." The emergency room nurse testified that Mother "was worried about [J.D.'s] behavior being out of control and was looking for a psych placement for [J.D.]." Both the physician and nurse testified to a lack of bonding between Mother and J.D. The physician discharged J.D. with instructions to follow up with family therapy intervention and with J.D.'s treating psychiatrist.

In May 2019, Mother drove J.D. to Boise, and he was admitted into an inpatient behavioral program. According to the child psychiatrist who admitted J.D. into the hospital, he was exhibiting behavioral issues of maladaptive aggression and suicidal thinking. Following this hospitalization, the Department filed a petition to obtain legal custody of J.D. and his three younger siblings under the CPA. After a shelter care hearing, the hospital discharged J.D. into the Department's care.

The magistrate court held a two-day, contested adjudicatory hearing in August 2019 and awarded the Department legal custody of J.D. The court, however, concluded that it did not have jurisdiction over his three younger siblings and dismissed the Department's petition as to those children, and the case proceeded only as to J.D. In September 2019, the court approved a case plan. The case plan identified tasks for Mother to perform to improve her ability to meet J.D.'s mental health and his emotional and developmental needs. Those tasks included, for example, that Mother learn about attention deficit hyperactivity disorder, work with the Department to identify J.D.'s needs, learn how to meet those needs, attend visitation with J.D., and demonstrate her ability to provide appropriate parental care for him.

During the case's pendency, the Department placed J.D. in several different foster care arrangements. Initially, the Department placed J.D. in foster care with his step-grandparents. Later, it transferred J.D. to a different foster home. Then, in July 2020, it transferred him to a residential treatment facility for children in crisis. According to a child psychiatrist who began treating J.D. in February 2021, he had "very severe struggles" while at the facility and was hospitalized twice for "out-of-control aggressive behavior directed toward his peers, other kids at the [facility], and staff." The psychiatrist testified that, while at the facility, "[J.D. was] very easily triggered by peers and noise and over activity. So there was a lot of uncontrollable tantruming and aggression in that environment because it's a group care environment with a lot of children."

After J.D. had resided at the residential treatment facility for approximately one year, the Department transferred him to reside with a family in July 2021, approximately six weeks before

the termination hearing in August 2021. At the time of the termination hearing, the family was not a licensed foster care family but had applied for a license. As a result, a licensed foster care family "in the area" was "involved" in "oversee[ing] J.D.'s care."

Also during the case's pendency, the magistrate court held numerous review hearings and a permanency hearing in March 2021. During that hearing, the court amended the permanency goal from reunification to a primary goal of termination of parental rights and adoption and a concurrent goal of reunification. In April 2021, the Department petitioned to terminate Mother's parental rights, and the court scheduled a termination hearing for August 2021. Approximately a week before that hearing, however, Mother left Idaho and drove to New Hampshire with her husband and other three younger children.[3]

The magistrate court held a termination hearing over the course of five days in August and September 2021. At the time of the hearing, Mother remained in New Hampshire and appeared at the hearing by video conference. Numerous witnesses testified including Mother, the guardian ad litem, three Department caseworkers, J.D.'s current foster mother, two child psychiatrists, a psychologist, two family therapists, and the emergency room doctor and the nurse who had treated J.D. Additionally, Mother called her husband, her mother-in-law, and a neighbor as witnesses.

Following the termination hearing, the magistrate court entered written findings of fact and conclusions of law terminating Mother's parental rights. Among other things, the court concluded that Mother had neglected J.D. by failing to provide him with proper parental care and control and by failing to comply with her case plan. *See* Idaho Code § 16-1602(31)(a) (defining neglect to include failing to provide proper parental care and control); I.C. § 16-2002(3)(b) (defining neglect to include failure to comply with case plan and the Department having custody of the child for fifteen of the most recent twenty-two months). Additionally, the court concluded that Mother is unable to discharge her parental responsibilities under I.C. § 16-2005(1)(d) and that termination of her parental rights is in J.D.'s best interests.

Mother timely appeals the magistrate court's judgment terminating her parental rights.

---

[3]     The magistrate court made specific findings about Mother's decision to travel to New Hampshire before the termination hearing. The court found that Mother did not inform the court, her attorney, the caseworker, or the guardian ad litem of her plan to travel to New Hampshire; Mother's testimony on the subject was "not credible"; and "the family intended to move with no intention of Mother and the younger siblings returning to Idaho."

4

## II.

## ANALYSIS

**A.      Orders Entered in Underlying CPA Case**

Mother asserts numerous challenges on appeal, including challenging the magistrate court's orders entered during the pendency of the CPA case. Those challenges include that the court erred by: (1) finding the Department had made reasonable efforts towards reunification, (2) changing the permanency goal from reunification to termination of parental rights, and (3) denying Mother's motion for an extended home visit and to vacate the termination hearing. As discussed below, because I.C. § 16-1625(1)(c) provided for appeal of these orders to the district court or to seek permissive appeal to the Idaho Supreme Court, we decline to address Mother's challenges to those orders.

### 1.      Reasonable reunification efforts

Mother asserts the magistrate court "erred in finding [the Department] made reasonable efforts towards reunification from the review hearings." Mother argues that "substantial, competent evidence does not support the court's finding that the Department's efforts were reasonable and that the Department failed to support "the reunification goals" and "to implement reasonable efforts that would ensure [J.D.'s] ongoing health and wellbeing." In support, Mother cites evidence from numerous review hearings, which she contends supports that the Department's efforts at reunification were not reasonable.

The Idaho Supreme Court, however, has definitively ruled that an "inquiry into the Department's efforts at reunification is irrelevant to the termination of parental rights." *Idaho Dep't of Health & Welfare v. Doe*, 164 Idaho 883, 888, 436 P.3d 1232, 1237 (2019); *see also State, Dep't of Health & Welfare v. Doe (2019-31)*, 166 Idaho 357, 361, 458 P.3d 226, 230 (Ct. App. 2020) ("It is well-settled that the Department's efforts at reunification are not relevant to the magistrate court's termination decision under I.C. § 16-2005."). Mother acknowledges this ruling but argues she lacks "immediate appellate recourse for a court's determination of the Department's reasonable efforts [which] impacts her due process rights for termination of parental rights."

We disagree. As this Court previously ruled in *Doe (2019-31)*, 166 Idaho at 360-61, 458 P.3d at 230-31, "[t]here is a statutory right to appeal at several points during the pendency of the child protection proceeding." Idaho Code § 16-1625(1) sets forth this right and provides, in part, that an aggrieved party may appeal "[a]n adjudicatory decree," "[a]ny order subsequent to the

adjudicatory decree that vests legal custody of the child in the department," or "[a]ny order subsequent to the adjudicatory decree that authorizes or mandates the department to cease reasonable efforts to make it possible to return the child to his home." I.C. § 16-1625(1)(a)-(c).[4]

Based on this statutory scheme, this Court rejected the parent's argument in *Doe (2019-31)*, 166 Idaho at 361, 458 P.3d at 231, that review under the scheme does not satisfy due process. Further, this Court concluded that an appellate review of the Department's reasonable efforts following a termination is contrary to the statutory scheme and noted "important policy reasons" the legislature did not include reasonable efforts as a required finding after the Department files a termination petition. *Id.* Accordingly, we conclude Mother's due process rights were not violated, and we decline to address Mother's argument that substantial and competent evidence does not support the district court's findings during the pendency of the CPA case that the Department made reasonable efforts to reunify J.D. with Mother.

### 2. Change of permanency goal to termination

Mother also similarly asserts the magistrate court "erred in changing the permanency goal to termination of parental rights" during the pendency of the CPA case. In support, Mother cites to evidence admitted during the permanency hearing; contends the court acknowledged during the hearing a "need for additional visitation," which Mother asserts confirms she "was in compliance with her case plan tasks and reasonably able to reunify with the minor"; and argues "[n]othing regarding [Mother's] progress prevented her from the return of her son to the household." In response, the Department argues the court did not abuse its discretion in changing the permanency goal from reunification to termination. In support, the Department relies on *Idaho Dep't of Health & Welfare v. Doe*, 163 Idaho 565, 569, 416 P.3d 937, 941 (2018), ruling that "the applicable standard of review of a magistrate court's decision to accept, modify, or reject the Department's proposed permanency plan" is the abuse of discretion standard. The guardian ad litem, however, argues Mother was required but failed to appeal the court's order changing the permanency goal under I.C. § 16-1625(1).

We agree with the guardian ad litem that Mother was required to appeal the magistrate court's order in the CPA case changing the primary permanency goal from reunification to

---

[4]     The aggrieved party may appeal such orders to the district court or may seek a direct permissive appeal to the Idaho Supreme Court. I.C. § 16-1625(1).

6

termination of parental rights under Idaho Code § 16-1625(1)(c). This statute provides that "an aggrieved party may appeal" "[a]ny order subsequent to the adjudicatory decree that authorizes or mandates the department to cease reasonable efforts to make it possible to return the child to his home" to the district court or to seek a direct permissive appeal of this order to the Idaho Supreme Court. *Id.* The magistrate court's order changing the permanency goal is such an order.

Mother does not reply to the guardian ad litem's assertion that she was required to appeal the magistrate court's order changing the permanency goal under I.C. § 16-1625(1)(c). Specifically, she makes no argument and cites no authority that--despite her appellate rights under I.C. § 16-1625(1)--she may appeal the order after the magistrate court's judgment terminating her parental rights. For the same reasons articulated in *Doe (2019-31)* that a parent may not challenge reasonableness of the Department's reunification efforts post-termination, we conclude Mother may not appeal the magistrate court's order changing the permanency goal in the CPA case post-termination. The legislature provided for statutory appellate review of the magistrate court's order changing the permanency goal, and this Court will defer to that authority absent a constitutional violation. *See Doe (2019-31)*, 166 Idaho at 361, 458 P.3d at 230 (noting grant of statutory appellate review is within the legislature's purview).

We do not construe the Idaho Supreme Court's decision in *Doe*, 163 Idaho 565, 416 P.3d 937, on which the Department relies, to provide otherwise. *Doe* is a post-termination CPA case. *Id.* at 567, 416 P.3d at 939. After the termination of parental rights, "the Department filed a post-termination permanency plan that requested a change in the permanency goal from adoption by relative to adoption by non-relative." *Id.* The magistrate court rejected this request, and the Department appealed. *Id.* On appeal, the Court noted the magistrate court entered the order on the permanency plan *after* entering a judgment terminating parental rights. *Id.* at 568, 416 P.3d at 940. As a result, the Court ruled that the Department's appeal was valid under Idaho Appellate Rule 12.1(a)(2), which provides for an immediate appeal to the Court of an order entered after a final judgment in a CPA proceeding. *Doe*, 163 Idaho at 568, 416 P.3d at 940. The Court then ruled that "the applicable standard for review of a magistrate court's decision to accept, modify or reject the Department's proposed permanency plan" is for an abuse of discretion. *Id.* at 569, 416 P.3d at 941. The Court's

7

decision, however, does not support the proposition that an aggrieved party may appeal a *pretermination* order on a proposed permanency plan contrary to the CPA's statutory scheme under I.C. § 16-1625(1) for appellate review of such an order.

Moreover, even assuming that Mother's appeal of the order changing the permanency plan from reunification to termination were valid and that we were to review such an order for an abuse of discretion, Mother's argument otherwise fails. Mother fails to cite the four-prong test for determining whether a court abused its discretion or to explain how the court abused its discretion under that test. *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018) (articulating four-prong test for analyzing abuse of discretion). That failure is also fatal to Mother's challenge. *See State v. Jeske*, 164 Idaho 862, 870, 436 P.3d 683, 691 (2019) (requiring parties to argue abuse of discretion).

### 3. Denial of motion for extended home visit and continuance of termination hearing

Mother also challenges the magistrate court's denial of her request--following the Department's petition for termination of her parental rights--to review the case's status, to make a finding the Department failed to make reasonable efforts at reunification, to change the primary permanency goal to reunification, to authorize an extended home visit with J.D., and to vacate the termination hearing. Essentially, Mother's motion seeking this relief, including a finding that the Department failed to make reasonable efforts and to change the permanency goal to reunification, was a request for the court to reconsider its orders on such matters entered before the Department's petition for termination of her parental rights. For the reasons discussed above, Mother's requests to review the case's status, to find the Department failed to make reasonable reunification efforts, to change the primary permanency goal, and to authorize an extended home visit[5] are subject to appeal under I.C. § 16-1625(1) and are irrelevant to the termination of parental rights. *Cf. Doe*, 164 Idaho at 889, 436 P.3d at 1238 ("[I]nquiry into the Department's efforts at reunification is irrelevant to the termination of parental rights."); *Doe (2019-31)*, 166 Idaho at 361, 458 P.3d at 230 ("It is well-settled that the Department's efforts at reunification are not relevant to the

---

[5] To the extent Mother's appeal appropriately includes a review of the denial of her request to vacate the termination hearing, she fails to cite any authority or to make any argument on appeal challenging that denial. This Court generally does not address issues not supported by cogent argument and citation to legal authority, even in a case terminating parental rights. *Idaho Dep't of Health & Welfare v. Jane Doe (2018-24)*, 164 Idaho 143, 147, 426 P.3d 1243, 1247 (2018).

magistrate court's termination decision under I.C. § 16-2005."). Because Mother did not seek a timely appeal under I.C. § 16-1625(1), we decline to address the merits of her challenges to the court's orders entered before its judgment terminating her parental rights.

**B.     Termination of Parental Rights**

**1.        Standard of review**

In addition to challenging the magistrate court's orders entered before the termination hearing, Mother also challenges the court's judgment terminating her parental rights. The following principles apply to a review of the termination of parental rights. A parent has a fundamental liberty interest in maintaining a relationship with his or her child. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Doe v. State*, 137 Idaho 758, 760, 53 P.3d 341, 343 (2002). This interest is protected by the Fourteenth Amendment to the United States Constitution. *State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007). Implicit in the Termination of Parent and Child Relationship Act is the philosophy that, wherever possible, family life should be strengthened and preserved. I.C. § 16-2001(2). Therefore, the requisites of due process must be met when terminating the parent-child relationship. *State v. Doe*, 143 Idaho 383, 386, 146 P.3d 649, 652 (2006). Due process requires that the grounds for terminating a parent-child relationship be proved by clear and convincing evidence. *Id.* Because a fundamental liberty interest is at stake, the United States Supreme Court has determined that a court may terminate a parent-child relationship only if that decision is supported by clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *see also* I.C. § 16-2009; *Doe v. Dep't of Health & Welfare*, 146 Idaho 759, 761-62, 203 P.3d 689, 691-92 (2009); *Doe*, 143 Idaho at 386, 146 P.3d at 652.

On appeal from a decision terminating parental rights, this Court examines whether the decision is supported by substantial and competent evidence, which means such evidence as a reasonable mind might accept as adequate to support a conclusion. *Doe v. Doe*, 148 Idaho 243, 245-46, 220 P.3d 1062, 1064-65 (2009). The appellate court will indulge all reasonable inferences in support of the trial court's judgment when reviewing an order that parental rights be terminated. *Id.* The Idaho Supreme Court has also said that the substantial evidence test requires a greater quantum of evidence in cases where the trial court's finding must be supported by clear and convincing evidence than in cases where a mere preponderance is required. *State v. Doe*, 143 Idaho 343, 346, 144 P.3d 597, 600 (2006). Clear and convincing evidence is generally understood to be evidence indicating that the thing to be proved is highly probable or reasonably certain. *Roe*

9

*v. Doe*, 143 Idaho 188, 191, 141 P.3d 1057, 1060 (2006). Further, the magistrate court's decision must be supported by objectively supportable grounds. *Doe*, 143 Idaho at 346, 144 P.3d at 600.

Idaho Code Section 16-2005 permits a party to petition the court for termination of the parent-child relationship when it is in the child's best interests and any one of the following five factors exist: (a) abandonment; (b) neglect or abuse; (c) lack of a biological relationship between the child and a presumptive parent; (d) the parent is unable to discharge parental responsibilities for a prolonged period that will be injurious to the health, morals, or well-being of the child; or (e) the parent is incarcerated and will remain incarcerated for a substantial period of time.

### 2.  Neglect

Mother challenges the magistrate court's conclusions that she neglected J.D under I.C. § 16-2005(b). The court concluded Mother neglected J.D. on two alternative grounds, including that J.D. "was without proper [parental] care and control necessary for his wellbeing" and that Mother failed to comply with her case plan.[6] *See* I.C. § 16-1602(31)(a) (defining neglect to include failing to provide proper parental care and control); I.C. § 16-2002(3)(b) (defining neglect to include failure to comply with case plan and department having custody of child for fifteen of the most recent twenty-two months). Each of these alternative conclusions provides an independent basis for terminating Mother's parental rights. *See Idaho Dep't of Health & Welfare v. Doe* (2012-16), 154 Idaho 175, 181-82, 296 P.3d 381, 387-88 (2013) (noting statutory grounds for termination of parental rights are independent and if court finds one or more grounds for termination, it may grant termination).

---

[6]     The magistrate court also concluded Mother "is unable to discharge her parental responsibilities" under I.C. § 16-2005(d). Although Mother challenges this conclusion, we decline to address the merits of this argument because she fails to establish the magistrate court erred by concluding she neglected J.D. under I.C. § 16-2005(b). *See Idaho Dep't of Health & Welfare v. Doe (2012-16)*, 154 Idaho 175, 181-82, 296 P.3d 381, 387-88 (2013) (noting statutory grounds for termination of parental rights are independent and if court finds one or more grounds for termination, it may grant termination).

### a. Proper parental care and control

Mother challenges the magistrate court's conclusion that "the child was without proper [parental] care and control necessary for his well-being." *See* I.C. § 16-1602(31)(a) (defining neglect to include failing to provide proper parental care and control). In support of this conclusion, the court found Mother was unable or refused "to provide appropriate care, attention, and supervision" of J.D. For example, the court found Mother failed to recognize J.D.'s "developmental level or normal childhood exuberance and boundary-testing" and that his behavior was "the product of being locked in a room, physically disciplined with extreme means, and criticized for every mistake." Further, the court found Mother wanted the Department, medical care providers and other caregivers "to 'fix'" J.D., but she was unwilling or lacked the desire to commit to the time necessary to parent J.D. The court also rejected Mother's inconsistent claims that "her poor demonstration of parenting skills [was] based on an inability to retain information regarding parenting" and that "she could appropriately parent [J.D.]." Finally, the court found "Mother did not complete programs she was perfectly capable of completing," noting specifically that she failed to "progress to Phase Two of [parent-child interactive therapy (PCIT)] after a year of sessions" and "did not finish therapy" because she sabotaged the relationship with the therapist.

Mother argues the magistrate court's description of her "actions and intent" do not "accurately reflect" the trial testimony. In support, Mother cites to numerous portions of the trial transcript which she contends shows "she followed medical advise [sic]," "complied with all medical recommendations," "demonstrate[d] her PCIT skills," and "completed a [trust-based relational intervention (TBRI)] training and was using the skills she learned in her visits."

Mother, however, does not identify any of the magistrate court's findings--with one exception[7]--which she contends are not supported by substantial and competent evidence. Rather,

---

[7]    Mother challenges the magistrate court's finding about the number of investigations the Department conducted related to Mother. Specifically, Mother claims that "the history of neglect is inaccurately reported by the [court] as the testimony was 16 calls for investigation (not 26)." Mother's argument, however, misstates the court's finding. The court found that "the family had 26 CPA referrals to [the Department], 16 investigated, and ten information-only."

Substantial and competent evidence supports this finding, including the testimony of a Department social worker, who testified:

>    Q. Do you know how many times people have called the central hotline regarding [Mother]?
>    A. Twenty-six.

Mother requests that this Court reweigh the evidence and substitute its view for that of the magistrate court's view, which we decline to do. *See Neustadt v. Colafranceschi*, 167 Idaho 214, 228, 469 P.3d 1, 15 (2020) ("[A]ppellate courts in Idaho do not reweigh evidence."); *In re Doe 2009-19*, 150 Idaho 201, 209, 245 P.3d 953, 961 (2010) ("It is not our role to reweigh the evidence.").

### b. Case plan compliance

Mother also challenges the magistrate court's alternative conclusion that she neglected J.D. by failing to comply with the case plan. *See* I.C. § 16-2002(3)(b) (defining neglect to include failure to comply with case plan and department having custody of child for fifteen of the most recent twenty-two months). Although the court concluded Mother completed some tasks, it concluded "Mother has been unable to comply with the two most important case plan tasks." Nonetheless, the court's decision indicates Mother failed to complete three tasks identified in the case plan.

The magistrate court found Mother failed to complete Task 1.1.1.3. This task requires that Mother work with her therapist, J.D.'s therapist, and a parent coach "to build a healthy, parent-child relationship." Regarding Task 1.1.1.3, the court found that "Mother was unwilling to make the sacrifice and devote the individual time to [J.D.] that he needed." The court attributes this unwillingness to Mother's "preferences for tending to [her] other children," "her mental health struggles," "her inability to apply what she learned over years of therapy and coaching," and "her continuation of known abusive parenting techniques (locking in room, negative blaming and criticism, overreactions to normal if ebullient behavior, etc.)."

The magistrate court also found Mother failed to complete Task 1.1.1.5. This task requires Mother to work with the Department to identify J.D.'s medical and mental health care needs. Regarding Task 1.1.1.5, the court found that "Mother did not show an ability to manage [J.D.'s]

---

Q. Do you know how many of those times they were just considered [an information and referral] and didn't go anywhere?
A. I'm going to look in my document to refresh my memory. Sixteen of those were investigated.
. . . .
Q. Has [Mother] ever been substantiated?
A. She has.
Q. How many times?
A. She's been substantiated three times for physical abuse.

12

mental health care needs," "refused to accept the diagnoses," "was unwilling and unable to . . . follow the recommendations," failed to devote even minimal time to addressing J.D.'s needs, and "failed to demonstrate competently the recommended parenting techniques."

Finally, the magistrate court found Mother failed to complete Task 1.1.1.6. This task requires Mother to demonstrate her ability to care appropriately for J.D., including demonstrating during scheduled visits the skills she learned in counseling. Regarding Task 1.1.1.6, the court found that, although Mother "did positive things during visits," she "never progressed to unsupervised visits" and "struggled to fully engage and could not pick up on [J.D.'s] cues" and that "every therapist [who] provided parenting coaching, training and supervision agreed that Mother, despite years of support, lacked competency to parent [J.D.]." Based on these failures, the court concluded, among other things, that "Mother never fully applied herself to training and using learned skills during visits"; "Mother has not demonstrated [an] understanding how to be a safe or protective parent"; and she never "progress[ed] to warrant unsupervised visits."

Again, Mother does not specifically challenge any of these findings. Instead, Mother argues that she complied with the case plan "to the extent [she] was allowed to participate" and that "barriers outside of [her] control . . . skew[ed] the accomplishments that were fundamentally most important."[8] Specifically, she identifies those barriers to include the coronavirus pandemic "restrictions," J.D.'s "relocation to 4 different foster placements," and changes in J.D.'s services and medications. Other than identifying these purported barriers to Mother's compliance with her case plan, Mother fails to explain how these events created circumstances beyond her control that made it impossible for her to comply with her case plan. *See Idaho Dep't of Health and Welfare v. Doe (2016-14)*, 161 Idaho 596, 600, 389 P.3d 141, 145 (2016) (holding impossibility defense occurs where circumstances are beyond parent's control); *see also State, Dep't of Health &*

---

[8]    In support of this argument, Mother cites *In re Termination of Parental Rights as to N.J.* (*In re N.J.*), 8 P.3d 126 (Nev. 2000). She quotes that case as stating that "the parent cannot be judged unsuitable by reason of failure to comply with requirements and plans that are unclear and have not been communicated to the parent, or which are impossible for the parent to abide by." The case, however, does not contain the quoted language or stand for that the quoted proposition. Rather, the quote is from *Champagne v. Welfare Div. of Nevada State Dep't of Hum. Res.*, 691 P.2d 849, 857 (Nev. 1984), which *In re N.J.* overrules. In *In re N.J.*, the Nevada Supreme Court addressed whether the biological parents who had not supported a child for seven years had abandoned that child under Nevada statutes providing for termination of parental rights. *Id.* at 135. Accordingly, *In re N.J.* provides no persuasive, applicable authority in this case.

13

*Welfare v. Doe (2020-47)*, 168 Idaho 496, 500, 483 P.3d 1039, 1043 (Ct. App. 2021) ("While the pandemic has undoubtedly changed the manner in which a parent must perform a case plan, Mother fails to articulate how the pandemic adversely impacted her ability to perform her case plan.")

Moreover, Mother's argument that certain barriers precluded her complete performance of the case plan suggests she is relying on the impossibility defense. *Idaho Dep't of Health and Welfare v. Doe*, 162 Idaho 236, 243, 395 P.3d 1269, 1276 (2017) (noting "impossibility may be asserted as a defense to a claim of neglect"). Mother, however, fails to address the magistrate court's conclusion that impossibility is not a defense to her failure to comply with her case plan because she was "responsible for her failure to make meaningful progress" under the plan.

Mother also asserts that she "was able to demonstrate" the "minimum" "knowledge and skills sufficient to return [J.D.] home and remain engaged in long-term services." In support, she claims she should "be credited with what she did right," is "able to describe a safety plan," discussed and demonstrated "her skills during visitations," and "has family support." Contrary to this argument, however, Mother never progressed to unsupervised visits because of her failure to demonstrate adequate parental skills, as the magistrate court found. Moreover, Mother's assertion that she should "be given credit for what she did right" simply requests that this Court reweigh the evidence, which again we decline to do. *See Neustadt*, 167 Idaho at 227, 469 P.3d at 14 ("[A]ppellate courts in Idaho do not reweigh evidence."); *In re Doe 2009-19*, 150 Idaho at 209, 245 P.3d at 961 ("It is not our role to reweigh the evidence.").

## 2. Best interests

Mother also challenges the magistrate court's conclusion that termination of her parental rights is in J.D's best interests. Once a statutory ground for termination has been established, the trial court must next determine whether it is in the best interests of the child to terminate the parent-child relationship. *Tanner v. State, Dep't of Health & Welfare*, 120 Idaho 606, 611, 818 P.2d 310, 315 (1991). When determining whether termination is in the child's best interests, the trial court may consider the parent's history with substance abuse, the stability and permanency of the home, the unemployment of the parent, the financial contribution of the parent to the child's care after the child is placed in protective custody, the improvement of the child while in foster care, the parent's efforts to improve his or her situation, and the parent's continuing problems with the law. *Doe (2015-03) v. Doe*, 159 Idaho 192, 198, 358 P.3d 77, 83 (2015); *Idaho Dep't of Health & Welfare v. Doe*, 156 Idaho 103, 111, 320 P.3d 1262, 1270 (2014). A finding that it is in the best

interests of the child to terminate parental rights must still be made upon objective grounds. *Idaho Dep't of Health & Welfare v. Doe*, 152 Idaho 953, 956-57, 277 P.3d 400, 403-04 (Ct. App. 2012).

In this case, the magistrate court concluded the relevant factors favored termination of Mother's parental rights.[9] In support, the court stated that "Mother cannot provide for the child's emotional, physical or developmental needs"; the child "needs a nurturing home with specially trained foster parents" because of his "obvious trauma history and maladaptive behaviors"; the child's foster parents provide a safe, secure, and loving environment; and "the child has noticeably improved and flourished while [in foster] care."

Challenging the magistrate court's best interests conclusion, Mother argues J.D.'s "agitate behaviors" are "directly related" to his foster care placement and his "lack of interaction with his family." Further, Mother notes that J.D.'s "most successful" foster placement was with his grandparents and contends his best interests include his ability to have a relationship with his siblings. In support, Mother does not identify any finding or conclusion that substantial and competent evidence does not support but instead repeats evidence from trial. Mother's challenge again simply requests that this Court reweigh the evidence and substitute its view of the facts for the magistrate court's view, which we decline to do. *See Neustadt*, 167 Idaho at 227, 469 P.3d at 14 ("[A]ppellate courts in Idaho do not reweigh evidence."); *In re Doe 2009-19*, 150 Idaho at 209, 245 P.3d at 961 ("It is not our role to reweigh the evidence.").

## III.

## CONCLUSION

This Court declines to consider Mother's challenges to the magistrate court's orders in the underlying CPA case. Further, the Court holds that Mother failed to establish the magistrate court erred by concluding that she neglected J.D. and that the termination of her parental rights is in J.D.'s best interests. Accordingly, we affirm the magistrate court's judgment terminating Mother's parental rights.

Judge GRATTON and Judge HUSKEY **CONCUR**.

---

[9] The magistrate court also references "[t]he Department's best interest factors" and generally cites a July 2017 standard articulating various "needs" for a child. A Department's criteria for foster placement, however, is not relevant to a judicial termination of parental rights.

15